**In re The KOREA CHOSUN DAILY TIMES, INC., Debtor.**

**No. 03–25450–ess.**

United States Bankruptcy Court,
E.D. New York.

Dec. 22, 2005.

Daniel K. Lee, Law Office of Daniel K. Lee, Palisades Park, NJ, for Debtor.

## MEMORANDUM DECISION GRANTING THE MOTION OF KENNEDY FUNDING, INC. FOR AN ORDER DIRECTING THE DEBTOR TO PAY SUPERPRIORITY ADMINISTRATIVE EXPENSE

ELIZABETH S. STONG, Bankruptcy Judge.

Before the Court is the motion of Kennedy Funding, Inc. ("KFI") dated October 11, 2005, for an order directing The Korea Chosun Daily Times, Inc., the debtor and debtor in possession in the above-captioned Chapter 11 case (the "Debtor"), to pay $100,000 either in satisfaction of KFI's priority lien pursuant to this Court's Order authorizing the sale of the Debtor's assets, or as a superpriority administrative expense entitled to immediate payment (the "KFI Motion"). The KFI Motion arises out of this Court's Order authorizing the Debtor to obtain postpetition financing from KFI, and providing for the payment of a loan commitment fee of $72,000 and reimbursement of reasonable legal fees and expenses, capped in the aggregate at $100,000, in the event that the loan does not close through no fault of KFI (the

"KFI Fee"). The Debtor objects to the KFI Motion, arguing that KFI was at fault in the failure of the financing transaction to close and therefore is not entitled to the KFI Fee. Based on the entire record and for the reasons stated herein, the KFI Motion, to the extent that it seeks payment of the KFI Fee as a superpriority administrative expense, is granted.

### Background

The Debtor filed for relief under Chapter 11 of the Bankruptcy Code on November 20, 2003, and was continued thereafter as debtor and debtor in possession in the management and operation of its business. The Debtor's principal asset was a commercial building of 18,000 square feet at 12–12 Queens Plaza South, Long Island City, New York (the "Property"). The Debtor also published the United States edition of a Korean daily newspaper, but ceased that activity in October 2002. The Debtor purchased the Property in August 2001, and gave a mortgage to Nara Bank, N.A. ("Nara Bank") in the principal amount of $1,250,000. The Debtor defaulted on this mortgage in March 2002, and in August 2003, Nara Bank obtained a judgment of foreclosure. The foreclosure sale was scheduled for November 21, 2003, but was stayed by the Debtor's bankruptcy filing.

After filing for bankruptcy, the Debtor pursued several different financing arrangements with the objective of recapitalizing the Debtor's business, avoiding foreclosure by Nara Bank on the Property, and restarting the Debtor's newspaper business. One such financing arrangement was a refinancing with KFI, described in the Debtor's motion for authorization to obtain postpetition secured financing from KFI, dated January 20, 2005 (the "KFI Loan"). Docket Entry 85. The KFI Loan would have provided

the Debtor with postpetition secured financing of $2.2 million, later increased to $2.4 million, to be used to satisfy the Nara Bank mortgage and other secured claims on the Property. The KFI Loan was approved by the Court by Order (1) Authorizing Debtor to Obtain Post–Petition Secured Financing and Grant Senior and Second Liens; (2) Authorizing Payments from Proceeds of Financing; (3) Modifying the Automatic Stay; and (4) Granting Related Relief, entered on March 30, 2005 (the "DIP Order"). Docket Entry 102.

The KFI Loan was initially contingent upon a closing occurring on or before April 8, 2005. DIP Order ¶ 15. By Consent Order dated April 14, 2005, the closing date was extended to April 15, 2005. Docket Entry 105. And on June 29, 2005, the Court entered a second Consent Order, extending the closing date to July 15, 2005. Docket Entry 111. By letter dated July 15, 2005, the Debtor's counsel informed the Court of an offer to purchase the Property, and subsequently the Debtor pursued a sale rather than the KFI Loan. Docket Entry 113. On August 30, 2005, the Debtor filed a motion seeking authorization to sell the Property. Docket Entry 139. After a hearing held on September 20, 2005, the Court entered an Order Approving Sale of Substantially All of Debtor's Assets, Debtor's Real Estate, Outside the Ordinary Course of Business, Free and Clear of Liens, Claims and Encumbrances Pursuant to 11 U.S.C. §§ 105 and 363 (the "Sale Order"). Docket Entry 154.

In accordance with the Sale Order, the Property was sold to House of Realty Inc. on September 27, 2005, for $4.6 million. According to the Second Amended Disclosure Statement in Respect to Debtor's Plan of Liquidation, filed on October 4, 2005, the Debtor made payments at the closing as follows: $1,798,458.15 to Nara

Bank, in satisfaction of the first mortgage; $319,765.10 to Tong Kon Yi, in satisfaction of the second mortgage; $61,700 to Susie Kim, in satisfaction of the third mortgage; $159,700 to Yun Sok Bae, in satisfaction of the fourth mortgage; $92,500 to Kaplon–Belo Associates, Inc., the real estate broker; $10,075 to Arkin–Medo, Inc., a judgment creditor; $43,715.34 to Advantage Title Company, for accrued real property taxes, building and Environmental Control Board violations, water and sewer charges, and title closer charges, among other charges; $600 to Kyung Kim, for Susie Kim's satisfaction of mortgage and delivery charge; and $200 to Lucy Jun, for notary charges. Second Amended Disclosure Statement at 8–9, Docket Entry 156. The net proceeds to the Debtor from the sale were $2,110,568.40. *Id.* at 9. It appears that the sale of the Property will allow the Debtor to pay all administrative expenses and creditors in full and to return a surplus to the Debtor's principal, Kyo Jong Kim.

The KFI Motion was accompanied by the Affidavit of Stuart Komrower of Cole, Schotz, Meisel, Forman & Leonard, P.A., counsel for KFI (the "Komrower Aff."). On October 18, 2005, the Debtor filed an affidavit of its principal, Mr. Kim, opposing the KFI Motion in its entirety (the "Kim Aff."). Docket Entry 166. On October 25, 2005, KFI filed a reply to the Kim Affidavit (the "KFI Reply"), an affirmation in support of the KFI Motion of Barry Schwartz (the "Schwartz Affirm."), a statement of Raymond Aab, the Debtor's former counsel, and affidavits of Cornelius V. Whooley (the "Whooley Aff."), Carl Scaringe (the "Scaringe Aff."), and Jeffrey Wolfer (the "Wolfer Aff."), in support of the KFI Motion. Docket Entries 168 to 173.

A hearing on the KFI Motion was held on October 25, 2005 (the "October 25 Hearing"), at which KFI by its counsel and the Debtor by its counsel appeared and were heard. On October 31, 2005, the Debtor filed a supplemental affidavit of Mr. Kim (the "Kim Supp. Aff."). Docket Entry 179. A continued hearing was held on November 8, 2005 (the "November 8 Hearing"), at which KFI by its counsel and the Debtor by its counsel appeared and were heard, and Mr. Kim testified.

### *Discussion*

KFI seeks an order directing the Debtor to pay the loan commitment fee of $72,000 and to reimburse KFI for its reasonable legal fees and expenses. KFI Motion ¶ 4. Although KFI represents that it has incurred legal fees and expenses of more than $90,000, KFI is seeking a total of $100,000 pursuant to the DIP Order, which provides that "in the event a closing does not occur through no fault of KFI, then the payments and reimbursements shall be capped at $100,000." DIP Order ¶ M. KFI argues that it was not at fault in the failure to close, and that the KFI Loan transaction did not close because the Debtor failed to deliver necessary documents, and ultimately, elected to sell the Property rather than proceed. KFI Motion ¶ 41.

KFI argues that it should be paid the KFI Fee immediately on two alternative grounds. First, KFI argues that the DIP Order granted KFI a recorded lien which, according to the Sale Order, should have been paid at the closing of the sale along with other recorded liens such as the Nara Bank mortgage. *Id.* ¶¶ 41–43. Second, KFI argues that because the DIP Order granted KFI a superpriority administrative expense, with priority over all other claims, liens, or interests in assets of the estate, and the net proceeds of the sale are enough to pay all creditors and claimants in full, the Debtor should pay the KFI Fee immediately. *Id.* ¶ 44. KFI acknowledges

that it has received $15,000 from the Debtor toward these amounts. *Id.* ¶ 42, n. 4.

The Debtor argues that KFI is not entitled to any fee or reimbursement because it was partially or entirely at fault in the failure of the KFI Loan to close. Kim Aff. ¶ 33. The Debtor points to events that occurred after July 15, 2005, the latest closing date approved by the Court, and argues that from that date until the Debtor sold the Property, it was ready and willing to close on the KFI Loan. *Id.* ¶ 23. The Debtor also seeks the return of the $15,000 that it has already paid to KFI. *Id.* ¶ 4. The Debtor further argues that if the Court finds that KFI was not at fault, then the payment should be capped at $20,000, not $100,000, because KFI indicated a willingness to settle for that amount. *Id.* ¶¶ 34–38.

*The DIP Order and Sale Order*

KFI is seeking relief based upon two orders issued by this Court in connection with the Debtor's efforts to reorganize, first by recapitalizing its business, and later by selling its primary asset, the Property.

The first order, the DIP Order, provides that the liens and security interests granted to KFI have "first and paramount priority over all administrative expenses and claims of any nature and over all other liens on any assets of the estate pursuant to Sections 364(c)(1) and (2) and Section 364(d) of the Bankruptcy Code," and that the liens and security interests granted to KFI in the DIP Order are "valid, perfected, enforceable, nonavoidable and effective by operation of law" as of the closing date without any further action, execution, filing or recordation of any documents by KFI. DIP Order ¶ I.

The DIP Order authorizes the Debtor to pay KFI a loan commitment fee and reimburse KFI for reasonable legal fees and expenses incurred in connection with the financing arrangement, without further order of the Court. *Id.* ¶ M. The DIP Order also provides that this payment is capped at $100,000, as follows:

> In the event a closing does not occur through no fault of KFI, then the payments and reimbursements shall be capped at $100,000.00, which shall have priority lien status over all other liens, claims and interests of every party, except Nara [Bank], and superpriority administrative expense status in accordance with Paragraph I herein.

*Id.* The DIP Order provides that KFI may not commence an action to recover the KFI Fee before September 1, 2005, and provides that the Debtor stipulates to the reasonableness of KFI's legal fees and expenses. *Id.* As described above, the DIP Order was amended by orders entered on April 14, 2005, and June 29, 2005, to extend the closing date, first to April 15, 2005, and then to July 15, 2005. *See* p. 775, *supra.*

The second order, the Sale Order, permits the sale and transfer of the Property free and clear of all liens, claims, or interests, and provides that "recorded liens such as the mortgage lien held by Nara Bank, N.A. shall be satisfied at the closing of the sale." Sale Order ¶ 9. The Sale Order also provides that "any and all liens" encumbering the Property will be transferred and attach to the proceeds of the sale "to the same extent and with the same force, validity, status and effect, if any as they had against the [Property] prior to the sale." *Id.*

*The Failure To Close*

The threshold question on this Motion is whether KFI was at fault in the failure of the KFI Loan to close. Paragraph M of the DIP Order permits KFI to recover its reasonable legal fees and expenses only if the failure to close is

"through no fault of KFI." DIP Order ¶ M. This is also the primary basis on which the Debtor opposes the KFI Motion.

The Debtor argues that KFI should not be paid the KFI Fee because KFI was at fault in the failure to close on the KFI Loan. Kim Aff. ¶¶ 4, 39. *See* Kim Supp. Aff. ¶ 9. The Debtor does not dispute that it was unable to produce the necessary documents by the original closing date, April 14, 2005. Kim Supp. Aff. ¶ 4. Mr. Kim states "Debtor does not contend that it failed to provide all the documents at the 4/14/2005 closing. This was never an issue." *Id.* Rather, the Debtor argues that all of the documents required prior to closing were delivered to KFI by July 18, 2005, and that other necessary documents did not have to be produced until the day of the closing. Kim Aff. ¶¶ 25–27; Kim Supp. Aff. ¶ 4.

The Debtor also argues that it was "ready and willing" to close after April 14, 2005, and that KFI prevented a closing from occurring by unreasonably refusing to provide the Debtor with a closing date. Kim Aff. ¶ 23. The Debtor describes the efforts of Mr. Kim over a period of some two months, from July 18, 2005, to September 18, 2005, to secure a closing date from KFI, including numerous office visits and telephone calls to Jeffrey Wolfer, KFI's president, and Henry Haskell, president of KSI Funding, Inc., described by Mr. Kim as a major investor in KFI and participant in the KFI Loan. *See id.* ¶¶ 5–9, 13–16, 18–20, 22–23. These include meetings on July 18, 19, and 26, 2005, attempted meetings on August 2 and 18, 2005, and meetings on August 26, and 29, and September 12 and 15, 2005. *See id.*

¶¶ 5–11, 13–16, 18–20. *See also* Kim Supp. Aff. ¶¶ 6–7. The Debtor acknowledges that simultaneously with many of these meetings, the Debtor's principal, Mr. Kim, was pursuing a sale of the Property. Kim Aff. ¶¶ 17–18, 20–21; Kim Supp. Aff. ¶ 7. As Mr. Kim states:

> [The] Debtor signed a contract to sell the building on 8/16/2005 ... With respect to the post–8/16/2005 meetings, these meetings took place because I was less than 100% sure that the Court would give its blessing to sell the building and I had to keep my KFI option open.

Kim Supp. Aff. ¶ 7.[1]

The Debtor also argues that its failure to seek Court approval of an extension of the closing date beyond July 15, 2005, did not stand in the way of KFI scheduling a closing date. Kim Aff. ¶¶ 28–29, 31; Kim Supp. Aff. ¶ 5. The Debtor states that only if the Debtor had arrived at the closing without the necessary order would such a failure justify paying the KFI Fee. Kim Supp. Aff. ¶ 5. Indeed, Mr. Kim avers:

> Even if KFI told me to get an extension order from the Court, I probably would not have gone through with the trouble and expenses of obtaining an extension order until I first got a firm closing date from KFI.

Kim Aff. ¶ 31.

In response, KFI argues that it worked diligently to pursue, and was willing to close on, the KFI Loan over an extended period of time, and that the KFI Loan failed to close first as a result of the Debtor's failure to provide documents re-

---

**1.** The Debtor also acknowledges that the initial Affidavit of Kyo Jong Kim "contains a mistake." Kim Supp. Aff. ¶ 7. In that Affidavit, Mr. Kim states that "[o]n September 15, 2005, at or about 3 p.m., only a day before I entered into a contact with House of Realty,

Inc. for the sale of the Building, I met Mr. Wolfer for the last time" and "[o]n September 16, 2005, a day after my last meeting with Mr. Wolfer, I entered into a contract to sell the Building to House of Realty, Inc." Kim Aff. ¶¶ 20–21.

quired for a closing, and later as a result of the Debtor's decision to pursue a sale rather than a refinancing of the Property. *See* KFI Motion ¶ 4.

KFI argues that as early as December 2004, it retained outside counsel, including Mr. Komrower and Barry Schwartz of Cole, Schotz, Meisel, Forman & Leonard, P.A., to represent it in connection with a proposed financing with the Debtor, and on January 3, 2005, "KFI extended and the Debtor accepted a commitment letter for KFI to loan $2.2 million to the Debtor ... to be secured by substantially all of the Debtor's assets," including the Property. Komrower Aff. ¶ 3. *See id.* ¶ 2, Exh. A; Schwartz Affirm. ¶¶ 2–3, Exh. A. That agreement was modified by a further agreement on March 15, 2005, to increase the amount of the KFI Loan to $2.4 million, increase the loan commitment fee to $72,000, and extend the closing date to April 8, 2005. *See* Komrower Aff. ¶ 4, Exh. B; Schwartz Affirm. ¶ 5, Exh. B. The financing described in these agreements was approved by the Court in the DIP Order entered on March 30, 2005. Docket Entry 102. *See* Komrower Aff. ¶ 5; Schwartz Affirm. ¶ 7.

KFI asserts that on April 8, 2005, the Debtor was not able to close on the KFI Loan because, among other reasons:

> [The Debtor] had not ... provided comments to KFI's closing documents and did not provide other necessary closing documents, including evidence of insurance, corporate charter documents, and a good standing certificate necessary to satisfy the title company. In addition, the Debtor had not provided, as it had promised, subordination agreements of certain lienholders, without which the financing could not close ...

Komrower Aff. ¶ 7. *See* Schwartz Affirm. ¶ 8. KFI agreed to extend the closing date "if the Debtor obtained such closing docu-

ments and Court approval to close after the initial expiration date." Komrower Aff. ¶ 8. *See* Schwartz Affirm. ¶ 9.

On April 14, 2005, an attempted closing was held, and was attended by, among others, Barbara Svoronos, counsel for Nara Bank, Mr. Kim, Mr. Schwartz, and Carl Scaringe, an independent title closer, on behalf of First American Title Insurance Company of New York ("First American"). *See* Schwartz Affirm. ¶ 10; Scaringe Aff. ¶¶ 1, 4. Mr. Schwartz states that several problems arose, including questions as to the representation of the Debtor, the provision of several documents including a certificate of insurance, a payoff letter, mortgage subordinations, the Debtor's by-laws, a certification of reinstatement and good standing certificate from New York's Secretary of State, an amended DIP Order, court approval to pay a broker's fee, and a counsel opinion letter. *See* Schwartz Affirm. ¶ 10.

Similarly, Mr. Scaringe states:

> At the attempted [April 14] closing, I could not as a representative of First American, issue the [title insurance] Policy because, among other things, the Debtor had not been reinstated by the Secretary of State, a good standing certificate was not furnished by the Debtor, and recordable subordinations were not in hand with respect to the Mortgages. As such, there simply were not sufficient proceeds available to close the financings and make payments necessary under the DIP Order which required liens to be paid in full or funds escrowed for such liens.

Scaringe Aff. ¶ 7. Mr. Scaringe further states:

> At the closing, KFI indicated its willingness to conduct a dry closing and sign the documents to be held in escrow, provided that the Debtor could obtain

the necessary closing documents, subordinations, certificates of good standing, among other things, within the next 30 days (and provided further court approval for the extension was granted). *Id.* ¶ 8.

Cornelius V. Whooley, vice president and counsel of First American, states that "First American's closing calendar indicates that on April 14, 2005, a representative of First American (Carl Scaringe) was scheduled to attend a closing on the financing at the offices of Cole, Schotz, Meisel, Forman and Leonard, P.A., which adjourned." Whooley Aff. ¶ 7. Mr. Whooley also confirmed that First American would insure a mortgage made by a bankruptcy debtor "where the time period provided by the court order authorizing the making of the mortgage had expired" only if "a further order extending the period for the making of the mortgage" was issued by the court. *Id.* ¶ 8. As noted above, the Debtor does not contest that it was not able to close on the KFI Loan in April 2005. *See* p. 778, *supra.*

KFI argues that efforts to close on the KFI Loan continued after the failed April 14, 2005, closing. Mr. Schwartz states that in late June 2005, KFI agreed to a further extension of the closing date, subject to court approval, and agreed to defer a portion of KFI's fees to allow the Debtor to have additional funds to pay its creditors. Schwartz Affirm. ¶¶ 12–13. On July 6, 2005, Mr. Aab, the Debtor's then-counsel, advised Mr. Schwartz that "because of his inability to contact Mr. Kim for nearly a week, a closing could not occur on July 8, 2005." *Id.* ¶ 14. Also on July 6, 2005, Mr. Schwartz advised Mr. Aab that several steps remained to be taken by the Debtor in order to satisfy the requirements of the title insurance company, including furnishing original loan and subordination documents, furnishing additional information about a $38,000, judgment, and providing proof of property insurance. *Id.*

Soon thereafter, on July 8, 2005, Mr. Aab advised KFI that he was resigning as the Debtor's counsel and would not represent the Debtor in connection with the KFI Loan. *Id.* ¶ 15. On July 11, 2005, Mr. Kim advised Mr. Schwartz by telephone that "he had fired Mr. Aab" and retained new counsel. *Id.* ¶ 16. Four days later, on July 15, 2005, Mr. Aab advised the Court by letter that without his knowledge, the Debtor had marketed the Property for sale and received an all-cash offer to purchase the Property for $4.3 million. Docket Entry 113.

On August 8, 2005, Mr. Schwartz sent loan documents to Daniel K. Lee, the Debtor's new counsel. Schwartz Affirm. ¶ 18. As Mr. Schwartz states:

[B]ecause Mr. Aab had reported a sale offer to the Court and the Court's authorization for the financing had provided for a closing to occur on or before July 15, 2005, KFI could not proceed unless authorized to do so by the Court. In my letter to Mr. Lee, I reminded him that KFI could not fund the loan without an appropriate order of the Court. . . . I do not believe that I ever heard from Mr. Lee after I sent the letter to him.

*Id.* Mr. Schwartz further states, and the Debtor does not dispute, that "[t]he Debtor did not seek further court approval to close on the financing." *Id.* ¶ 19.

KFI confirmed its willingness to pursue the KFI Loan by letter dated August 8, 2005, from Mr. Schwartz to Mr. Lee, stating that while "Kennedy Funding stands ready, willing and able to fund this loan, it cannot do so without an appropriate order of the Bankruptcy Court. Please advise as to where you stand with respect to such an Order." *Id.* Exh. C.

Finally, KFI acknowledges that Mr. Kim made frequent visits to KFI's offices, but Mr. Wolfer, KFI's president, states that he did not tell Mr. Kim that the Debtor had provided all of the documents necessary to close. Wolfer Aff. ¶ 8. Mr. Wolfer further states, "[t]he decision of whether documents were sufficient to close the financing was a determination to be made by KFI's counsel and the title company." *Id.*[2]

The record of this Chapter 11 case provides additional information and context concerning the efforts of KFI and the Debtor to close on the KFI Loan. Court approval of the KFI Loan was first sought by the Debtor's motion dated January 20, 2005. Docket Entry 85. Thereafter, the Court held at least seven hearings in this matter in which counsel for KFI participated in person or by telephone. *See* Docket Entries for February 8, 2005, February 9, 2005, February 15, 2005, March 29, 2005, June 28, 2005, July 20, 2005, and August 3, 2005. *See also* KFI Motion ¶ 36. Many filings relating to the KFI Loan were made by KFI and the Debtor. *See* Docket Entries 85, 93, 95, 96, 99, 100, 101, 104, 105, 111. KFI states, and the Debtor does not dispute, that KFI's counsel prepared several filings made by the Debtor relating to the KFI Loan, including two motions seeking approval of the KFI Loan, proposed orders, and consent orders. *See* KFI Motion ¶ 37. And the time records of the Debtor's former counsel, Mr. Aab, filed with the Court in connection with his fee application, reflect regular communications between the Debtor's then-counsel and KFI's counsel from January 2005 through August 2005. *See* Application for Compensation for Attorney for the Debtor in Possession, Attach. 6, Docket Entry 148.

The record of this case also shows that on July 15, 2005, Mr. Aab notified the Court of his intent to withdraw as counsel for the Debtor as a result of an offer procured by the Debtor to purchase the Property. *See* Docket Entry 113. That letter states:

> [I]n the past two weeks I was contacted by a real estate broker in Queens who informed me that the Debtor's principal Mr. Kim had placed the Debtor's building on the market for sale and that he received a bona fide offer of $4.3 million—all cash.... This is the first that I heard about such an offer.

*Id.* As noted above, more than three weeks later, on August 8, 2005, KFI's counsel Mr. Schwartz advised the Debtor by letter that "[w]hile Kennedy Funding stands ready, willing and able to fund this loan, it cannot do so without an appropriate order of the Bankruptcy Court. Please advise as to where you stand with respect to such an Order." Schwartz Affirm. Exh. C.

The record of this case further shows that while the Debtor requested extensions of the closing date of the KFI Loan on two different occasions—first by Consent Order dated April 14, 2005, and again by Consent Order dated June 29, 2005—the Debtor did not request any further extension of the closing date after the July 15, 2005, closing date passed. *See* Docket Entries 105, 111. This was confirmed by the Debtor's principal, Mr. Kim, in his testimony at the November 8 Hearing. Record of November 8 Hearing, Testimony of Kyo Jong Kim.

---

**2.** KFI also states that discussions of a compromise of KFI's claims between Mr. Kim and Mr. Haskell, if they occurred, are not relevant or binding because Mr. Haskell does not represent or speak for KFI, and is not authorized to negotiate on KFI's behalf. *See* Wolfer Aff. ¶ 11. Such discussions would not be admissible "to prove liability for or invalidity of [a] claim or its amount" in all events. FED. R. EVID 408.

Finally, the record of this case includes the Affidavit of Kyo Jong Kim in Opposition to Raymond Aab's Motion for Legal Fees, dated October 5, 2005 (the "Oct. 5 Kim Aff."). Docket Entry 161. In that affidavit, Mr. Kim states:

> [KFI] proposed to lend $2.4 million. But the terms of the loan were so outlandish—bordering on being unethical....
>
> The terms of the [KFI Loan] were so horrendous that Aab should not have even introduced [the KFI Loan] into the picture.
>
> . . .
>
> From the beginning, Aab had the duty to tell the Debtor that [the KFI Loan] is against its self-interest and advise against it....

Oct. 5 Kim Aff. ¶¶ 26–27, 31. That is, in opposing the KFI Motion, the Debtor states that it was ready and willing to close on the KFI Loan, but in opposing the fee application of its former counsel, Mr. Aab, the Debtor states that the terms of the KFI Loan were so onerous that it was "bordering on unethical" for the Debtor's counsel to represent the Debtor in connection with pursuing it. At a minimum, these conflicting positions raise a question as to whether the Debtor genuinely sought to close on the KFI Loan after the prospect of a profitable sale of the Property emerged. As the United States Trustee observed, as a result of the funds realized from the sale of the Property:

> [T]he Debtor is now in a position to pay all of its creditors in full and there will be funds remaining for the Debtor to use to reorganize. It is clear that the Debtor and the Principal wish to retain as much of these excess fund as possible and therefore are objecting to the fees of [Mr. Aab], as well as the claim of [KFI].

Statement of the United States Trustee Regarding the Fee Application of Raymond Aab, Esq. at 6, Docket Entry 175.

Based on the entire record, the Court finds that KFI was not at fault in the failure of the KFI Loan to close. The record shows that from as early as January 2005, KFI took steps to move the transaction to consummation, including retaining counsel, extending an offer, preparing documents, preparing filings for court, and participating in hearings. *See* p. 781, *supra*. The record also shows that KFI agreed to changes in the terms of the KFI Loan to respond to the Debtor's needs, including increasing the amount of the KFI Loan and extending the closing date, between January 2005 and April 2005. *See* pp. 778–779, *supra*. The record further shows that the Debtor was not able to complete the requirements for a scheduled closing in April 2005, and that KFI agreed to additional extensions of the closing date in an effort to bring the matter to a successful conclusion. *See* pp. 779–780, *supra*.

The record shows that in June 2005 and July 2005, KFI continued to pursue a closing of the KFI Loan, and agreed to further modification of the loan terms, including deferring a portion of its compensation. *See* p. 780, *supra*. And the record shows that additional issues arose in July 2005, as the Debtor's counsel resigned, citing Debtor's entry into a contract to sell the Property at the same time that he was representing the Debtor in connection with the KFI Loan. *See* p. 780 and n. 1, *supra*.

In sum, the record shows that for a period of many months, the Debtor was not able to complete all of the requirements to close the KFI Loan, and ultimately, that the Debtor decided to pursue a sale of the Property at a favorable price rather than a refinancing transaction in the form of the KFI Loan, and therefore,

that the failure of the KFI Loan to close was not the fault of KFI.

*Superpriority Administrative Expense Status*

 Section 364(c) of the Bankruptcy Code permits the Court, after notice and a hearing, to authorize the Debtor to incur post-petition debt with "priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title" when a debtor in possession is unable otherwise to obtain necessary credit. 11 U.S.C. § 364(c)(1). Such postpetition financing arrangements may include the payment of a loan commitment fee and reimbursement of reasonable fees and expenses in the event that the financing arrangement is not consummated. *See, e.g., In re Integrated Resources, Inc.,* 135 B.R. 746, 750 (Bankr.S.D.N.Y.1992), *aff'd,* 147 B.R. 650 (S.D.N.Y.1992) (describing the fees to be awarded when a financing transaction is not consummated). And courts have concluded that in appropriate cases, such fees may be entitled to administrative or superpriority administrative expense status. *See, e.g., In re 995 Fifth Avenue Assocs.,* 96 B.R. 24, 26 (Bankr.S.D.N.Y. 1989) (awarding administrative expense status to fees if they are not paid at the closing of the sale). *See also In the Matter of Bay Broadcasting, Inc.,* 182 B.R. 369, 374 (D.P.R.1995) (authorizing reimbursement of fees accorded administrative expense status pursuant to a sale order).

KFI argues that the DIP Order and Section 105 of the Bankruptcy Code show that it is entitled to immediate payment of the KFI Fee. KFI Motion ¶ 40. Paragraph M of the DIP Order states that if the KFI Loan does not close through no fault of KFI, then KFI will be entitled to up to $100,000 in payments and reimbursements with "superpriority administrative expense status in accordance with Paragraph I." DIP Order ¶ M. Paragraph I provides that KFI's administrative expense claim has "first and paramount priority over all administrative expenses and claims of any nature and over all other liens on any assets of the estate pursuant to Sections 364(c)(1) and (2) and Section 364(d) of the Bankruptcy Code." *Id.* ¶ I. Section 105 authorizes the court to "issue any order, process, or judgment that is necessary and appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

Here, the record shows that the DIP Order authorizes the Debtor to obtain postpetition financing through KFI. The record shows, and the Debtor does not contest, that after appropriate notice, the Court held a hearing on the KFI Loan on March 29, 2005, considered the arguments and pleadings, and concluded that the Debtor had an immediate financial need for postpetition financing and was unable to obtain unsecured credit pursuant to Sections 364(a) or 364(b) of the Bankruptcy Code or priority or secured credit solely pursuant to Section 364(c). *See* DIP Order ¶¶ 3, 7–8.

The record also shows that the KFI Loan did not close, and that KFI was not at fault in the failure of the KFI Loan to close. *See* pp. 771–783, *supra.* As a result, and pursuant to the terms of the DIP Order, KFI is entitled to the payment of a loan commitment fee of $72,000 and reimbursement of reasonable legal fees and expenses, capped in the aggregate at $100,000. DIP Order ¶ M. *See* p. 777, *supra.* Finally, the DIP Order provides that the KFI Fee is entitled to first priority over all other liens and interests. DIP Order ¶ I. Therefore, based on the entire record, the Court finds that the KFI Fee is entitled to superpriority administrative expense status.

*Recorded Lien To Be Satisfied at Sale*

■ KFI argues that it is entitled to immediate payment of the KFI Fee pursuant to the Sale Order, which requires all recorded liens to be paid at the time of closing. Sale Order ¶ 9. KFI asserts that its entitlement to be paid has the status of a recorded lien as a result of the terms of paragraph I of the DIP Order.

Paragraph I of the DIP Order states:

The liens and security interests granted to KFI ... in this Order shall be valid, perfected, enforceable, nonavoidable and effective by operation of law as of the Closing Date without any further action by the Debtor, KFI and Nara [Bank] and without the execution, filing or recordation of any financing statements, security agreements, mortgages, amendments to the Post–Petition Loan Agreement or any other documents.[3]

DIP Order ¶ I. Thus, KFI argues, the KFI Fee should have been paid at the closing of the sale of the Property, and should now be paid promptly. KFI Motion ¶ 43.

While the record may well establish that KFI has a valid and enforceable lien, the Court is not persuaded that KFI's lien has the status of a recorded lien that should have been paid upon the closing of the sale of the Property, for at least two reasons. First, KFI's argument does not give effect to another provision of the DIP Order, which states that while recordation is not necessary to enforce the lien, KFI may record the DIP Order if it wishes to do so for any reason. DIP Order ¶ K. Similarly, the Sale Order refers to the satisfaction at the closing of the sale of recorded liens, not liens with the same validity and effect as a recorded lien. Sale Order ¶ 9. Second, and more generally, while the DIP Order affords KFI a valid lien entitled to

priority treatment, so that recordation is not necessary to enforce it, the DIP Order does not vitiate or nullify the recording process. *Cf. Sampsell v. Straub,* 194 F.2d 228, 230 (9th Cir.1951) ("recordation [of an abstract of judgment] is an independent step in the sense of being something voluntary beyond the entry of judgment ... [and is] a device to give a judgment a particular additional effect."). Accordingly, based on the entire record, the Court finds that KFI has a priority lien on the proceeds of the sale of the Property, but does not have a recorded lien entitling it to payment upon the closing of the sale.

*The Timing of the Payment*

■ The Bankruptcy Code does not specify when an allowable administrative expense should be paid. *See* 4 COLLIER ON BANKRUPTCY ¶ 503.03 at 503–13 (15th ed.2005). Rather, the Bankruptcy Code sets the outside date by which administrative expenses must be paid in a Chapter 11 case—that is, the effective date of the plan. 11 U.S.C. § 1129(a)(9). The question of whether administrative expenses should be paid sooner than the effective date of the plan is committed to the sound discretion of the bankruptcy court. *In re Baptist Medical Ctr. of New York, Inc.,* 52 B.R. 417, 421 (E.D.N.Y.1985), *aff'd,* 781 F.2d 973 (2d Cir.1986) (court had discretion to delay payment of an administrative expense). *See also In re Colortex Indus. Inc.,* 19 F.3d 1371, 1384 (11th Cir.1994) (court did not abuse its discretion in fixing the timing of administrative expense payments).

■ Where a debtor is insolvent, courts may defer paying administrative expenses until confirmation of a plan in order to ensure the "orderly and equal distribution among creditors and the need to pre-

---

**3.** The Closing Date was originally defined as April 8, 2005, but was later extended pursuant to consent orders to April 15, 2005, and then to July 15, 2005. *See* p. 775, *supra.*

vent a race to a debtor's assets." *In re HQ Global Holdings*, 282 B.R. 169, 173 (Bankr.D.Del.2002). *See also In re Standard Furniture*, 3 B.R. 527, 532 (Bankr. S.D.Cal.1980) (distributions prior to confirmation are disallowed if administrative expenses cannot be paid in full). But where the debtor is solvent, immediate payment may be appropriate. *In re Pudgie's Dev. of NY, Inc.*, 239 B.R. 688, 692–93 (S.D.N.Y. 1999) (landlord was entitled to immediate payment of rent because the bankruptcy estate was solvent).

■ Here, there is no risk of insolvency, as the parties agree that the sale of the Property has generated sufficient proceeds to pay all administrative claimants and creditors in full. And as described above, the KFI Fee has superpriority status, so that it should be paid before other administrative expenses or the claims of other creditors are paid. *See* p. 783, *supra.* Based on the entire record, the Court finds that it is appropriate for the Debtor promptly to pay the KFI Fee as a superpriority administrative expense.

### Conclusion

Based on the entire record and for the reasons stated herein, the Court concludes that KFI is entitled to be paid the KFI Fee in a total amount of $100,000 by the Debtor, and it is entitled to receive that payment immediately as a superpriority administrative expense. The Court also concludes that the Debtor should be directed promptly to pay to KFI the amount of $85,000, representing the KFI Fee of $100,000, reduced by the amount of $15,000 already paid to KFI by the Debtor. An Order in accordance with this Memorandum Decision will be entered simultaneously herewith.