**In re FLEETWOOD ENTERPRISES, INC., et al., Debtors.**

No. 09–14254–MJ.

United States Bankruptcy Court,
C.D. California,
Riverside Division.

April 8, 2010.

Anne A. Uyeda, Craig Millet, Kenneth A. Glowacki, William C. Bollard, Julander Brown & Bollard, Irvine, CA, Solmaz Kraus, Los Angeles, CA, for debtors.

Abram Feuerstein, Elizabeth A. Lossing, Office of the U.S. Trustee, Riverside, CA, for U.S. Trustee.

## OPINION

MEREDITH A. JURY, Bankruptcy Judge.

The Official Committee of Creditors Holding Unsecured Claims of Fleetwood Enterprises, Inc. and its affiliated debtors and debtors-in-possession filed a motion seeking turnover under § 542[1] of a $2.4 million commitment fee that debtors paid to Bank of America, National Association ("BofA") in connection with a court-approved postpetition debtor-in-possession ("DIP") interim financing order.

For the reasons set forth below, the court DENIES the Committee's motion.

### I. FACTS AND PROCEDURAL BACKGROUND

Debtors filed their voluntary chapter 11 petitions on March 10, 2009 and continue

---

1. Unless otherwise indicated, all chapter, section and rule references below are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037.

to operate their businesses as debtors-in-possession under §§ 1107 and 1108. When debtors sought protection under chapter 11, their financial picture was bleak. As a consequence, debtors determined the best option for reorganization was to sell various divisions. (Decl. of Andrew M. Griffiths in Support of First Day Pleadings ¶¶ 53, 57 Dkt. No. 10.) In the meantime, they needed funds to continue operations and maintain the value of their businesses.

By way of first day motions filed on March 12, 2009, debtors sought the interim use of cash collateral subject to the security of the lenders represented in court by BofA. After a hearing on March 13, 2009, an interim order for use of cash collateral was entered by stipulation on that date, scheduling a final hearing on March 26, 2009. The use of cash collateral under the interim order expired on March 29, 2009. In the meantime, as represented by debtors to the court on March 13, 2009, debtors sought postpetition financing with BofA and any other viable lenders.

Ultimately, BofA was the only lender willing to lend to debtors on terms which were economically viable.[2] BofA agreed to lend debtors an amount not to exceed $80 million, including a $65 million sub-limit for existing letters of credit; to do so, BofA required the payment of numerous fees and expenses under the financing agreement, including the $2.4 million commitment fee.

Instead of seeking final approval of use of cash collateral as scheduled on March 26, 2009, on March 24, 2009 debtors filed an Emergency Motion for Entry of Interim and Final Orders (1) Authorizing Debtors to Obtain Postpetition Secured Financing, (2) Authorizing the Use of Cash Collateral, (3) Granting Liens and SuperPriority Claims, (4) Modifying the Automatic Stay and (5) Setting a Final Hearing. As part of the motion, debtors requested the court to enter an interim order authorizing it to borrow from BofA as a postpetition lender.

The motion and supporting evidence showed that debtors had an urgent need for postpetition financing in order to continue their operations and preserve the value of their businesses. Debtors proposed to obtain the financing by providing superpriority claims, security interests and liens to BofA under § 364(c)(1), (2), and (3) and § 364(d). Due to debtors' immediate need for access to cash collateral and other funds, the court held expedited hearings on March 26, 27 and 31, 2009.

At the March 26, 2009 hearing, numerous parties objected orally to the proposed financing, including the Committee.[3] The Committee alleged, among other things, that debtors did not need to borrow new money until sometime in April. According to the Committee, the urgent nature of the motion was due to covenants in the existing cash collateral order—debtors would be in default if the financing was not approved on an interim basis. (Tr. 27:1–10, March 26, 2009.) The Committee further objected to the commitment fee, referring to it as "outrageous". (*Id.* 28:22.) Due to these issues and others, and the abundance of pleadings and documents filed within a very short time, the Committee suggested the interim financing order provide a blanket reservation of rights with respect to the issues that were raised. (*Id.* at 17–20.) BofA refused the request.

At the court's urging, further negotiations regarding a broad reservation of

---

**2.** BofA was acting as the administrative agent for a syndicate of lenders.

**3.** Deutsche Bank Trust Company Americas and Whippoorwill Associates filed written objections which raised issues not pertinent to this motion.

rights ensued, but the parties were unable to resolve all of the issues. The parties appeared before the court for a second hearing on March 27, 2009. BofA's counsel confirmed that the commitment fee, along with certain other provisions pertaining to new security if advances were made, was a non-negotiable point and that the lenders required payment of the fee prior to any lending. BofA explained that the lenders' view was that they were making the commitment now, they were agreeing that their capital would be set aside for DIP financing loans and as a result they should be entitled to the commitment fee when the commitment was actually made (as opposed to waiting until the final order). (Tr. 7:19–25, March 27, 2009.) Further, BofA was unwilling to move forward without a full comprehension of its rights and obligations during the interim period.

The Committee again objected to the fee, commenting that it was "obscenely high" for what it perceived to be a $20 million credit facility. (Id. 13:17.) Debtors reiterated that the "market was tough" and the fee lowered their interest rate. (Id. 24:15–17.) Given the reduced interest rate and the amount of the loan, the court observed that the amount of the commitment fee was not necessarily unreasonable. (Id. 35:16; 36:5–12.)

On March 31, 2009 the court held a third hearing at which the Committee again raised its concern about the fee.[4] (Tr. 5:9–22, March 31, 2009.) After hearing oral argument, the court approved the heavily negotiated terms of the DIP loan and entered an interim order on April 1, 2009. The interim order scheduled a final hearing for April 21, 2009, which was rescheduled for April 30, 2009 at debtors' request.

On April 1, 2009 the commitment fee was charged against debtors' DIP loan account.[5] (Decl. of Todd R. Eggertsen, November 18, 2009, 1:24–25.) The Committee did not appeal the interim order.[6]

Less than twenty-four hours before the final hearing, debtors informed BofA that they were withdrawing their request to proceed with the DIP loans. Debtors, realizing that they could survive on the use of cash collateral alone, filed a new motion for use of cash collateral and thereafter negotiated a series of interim agreements to continue using cash collateral, which culminated in a Final Order Extending Authorization to Use Cash Collateral entered on September 10, 2009, extending the use to January 31, 2010.[7]

On November 2, 2009 the Committee filed its Motion for Turnover of Property of the Estate Pursuant to 11 U.S.C. § 542.[8] After hearing oral argument on

---

4. A hastily negotiated interim agreement extended debtors' use of cash collateral to March 31, 2009.

5. The Committee asserts that although the underlying credit agreement authorized BofA to charge the commitment fee to debtors' loan account, debtors instead paid the fee from their operating cash. (Notice of Motion and Motion for Turnover of Property of the Estate Pursuant to 11 U.S.C. § 542 filed November 2, 2009, 4:14–16). The Committee contends that the operating cash constituted property of debtors' estate. (Id.). Given the court's conclusion, it is unnecessary to resolve this factual inconsistency.

6. Whether the order was "final" and therefore automatically appealable is discussed below.

7. This order has since been extended by agreement.

8. The Committee obtained standing to file the turnover motion by a court-approved stipulation with debtors entered on August 10, 2009. The court and parties agreed that the Committee would seek turnover of the commitment fee by motion and, therefore, no adversary proceeding was necessary.

December 16, 2009, the court took the matter under submission.

## II. JURISDICTION

This court has jurisdiction to determine this matter pursuant to 28 U.S.C. § § 1334 and 157(b)(*l*) and General Order No. 329 of the United States District Court for the Central District of California. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (E).

## III. ISSUES

A. Whether the commitment fee constitutes an administrative expense claim under § 503(b)(1)(A) subject to the requirements that it directly and substantially benefit debtors' estates;

B. Whether the commitment fee is entitled to protection under the safe harbor of § 364(e); and

C. Whether modification of the interim order is appropriate under either Fed. R.Civ.P. 60(b)(6), *incorporated by* Rule 9024 or § 105(a).

## IV. DISCUSSION

Summarized, the Committee's arguments are: (1) turnover is appropriate because the commitment fee did not benefit debtors' estates or otherwise meet the requirements as an actual or necessary expense under § 503(b)(1)(A); (2) the court has the inherent equitable power to reexamine its prior ruling because the interim order is interlocutory and the equities weigh in favor of the unsecured creditors; or, alternatively, (3) if the interim order is a final order, Fed.R.Civ.P. 60(b)(6) provides a basis for this court to grant the Committee relief.

On the other hand, BofA asserts that turnover of the fee is precluded by the explicit language of the interim order and § 364(e). BofA contends it is too late for any relief regarding the fee since the Committee failed to appeal this court's interim order within ten days from the entry of the order. Finally, BofA argues that even if the court has discretion to reconsider the interim order with respect to the commitment fee provision, the evidence shows that debtors received a direct and substantial benefit by having access to the funds during the interim period.

The resolution of this matter turns on the statutory construction of § 364(c)(1) and (e) and the unambiguous terms of the interim order.

## A. The Plain Language Of § 364(c)(1) Does Not Incorporate The Requirements for Allowance of Administrative Expenses Under § 503(b)(1)(A)

 Initially, the court observes that the issue whether BofA could establish an administrative expense priority claim for the commitment fee under § 503(b)(1)(A) was not raised or addressed during the three March 2009 hearings which culminated in the interim order. Now, after the fact, the Committee argues that the fee did not benefit debtors' estates or otherwise meet the requirements as an actual or necessary expense under § 503(b)(1)(A).

The interim order approving the financing agreement between BofA and debtors specifically provides that the fees incurred in connection with the DIP loan, including the commitment fee, would be paid on a superpriority basis under § 364(c)(1). There is no reference to § 503(b) in the order.

Paragraph 5 of the interim financing order provides in relevant part:

[A]ny and all fees paid or required to be paid in connection with the DIP Loan Documents ... are hereby authorized and shall be paid ... each with the same priority as the Postpetition Obligations and without further notice to or order of the Court. ...

Paragraph 9(c), entitled *"Superpriority Claims"* provides in relevant part:

All Postpetition Obligations, subject only to the Carve–Out, hereby constitute under Section 364(c)(1) *allowed superpriority administrative expense claims*.... (emphasis added).

The Bankruptcy Code does not use the term "superpriority", but it is generally understood as a short-hand term "to articulate the priority that § 364(c)(1) confers over administrative expense claims." *Matter of Mayco Plastics, Inc.*, 379 B.R. 691, 701–02 (Bankr.E.D.Mich.2008). In fact, not all parties use the same terms in this area of the law. The court's cursory examination of case law in this area reveals that courts and practitioners use terms to describe § 364(c)(1) claims as those with "super-super priority", "superpriority status" or "administrative priority claims" or, like debtors did here, "superpriority administrative expense claims."

 However, this court is not bound by the terminology of the parties and must follow the plain language of the statute. *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241–42, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)(if the words of the statute are clear, the court must apply the statute by its terms unless to do so would lead to absurd results). Besides the plain language, the court also examines "the specific context in which that language is used, and the broader context of the statute as a whole." *Hough v. Fry (In re Hough)*, 239 B.R. 412, 414 (9th Cir. BAP 1999) (citation omitted).

Section 364 provides in relevant part:

(b) The court, after notice and a hearing, may authorize the trustee to obtain unsecured credit or to incur unsecured debt ..., allowable under section 503(b)(1) of this title as an administrative expense.

(c) If the trustee is unable to obtain unsecured credit allowable under § 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—

(1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

. . . .

The language of § 364(c)(1) is clear enough—a debtor's authority to obtain unsecured credit under that subsection is expressly premised on its inability to obtain credit under § 503(b)(1), i.e. as an allowable administrative expense under § 364(b). There is no other legislative requirement under the statute.

Here, debtors were unable to obtain unsecured credit from BofA by giving it an allowable administrative expense under § 503(b)(1). In fact, nowhere does their motion or the interim order mention § 364(b) or obtaining unsecured administrative priority debt. Rather, BofA required the greater protection under § 364(c)(1) of a priority claim "over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title."

Notably, the plain language of the statute does not say that to establish priority "over any or all administrative expenses" under § 364(c)(1), lenders must also independently prove their claim qualifies as an allowable administrative expense under § 503(b)(1)(A). *Cf. Mark IV Props., Inc. v. Club Dev. & Mgmt. Corp. (In re Club Dev. & Mgmt. Corp.)*, 27 B.R. 610, 611–12 (9th Cir. BAP 1982)(holding that an order granted pursuant to § 364(b) must be supported by a finding that the debt was an actual, necessary cost and expense of preserving the estate). Such a result would render subsection (b) superfluous and put additional burdens on lenders who do not agree to administrative expense priority

but instead require priority over those very types of claims.

[A] debt authorized under § 364(c)(1) is not just a kind of an administrative expense under § 503(b). It is by its nature different, indeed superior, in the sense that it must be paid with 'priority' over all administrative expenses. To state it another way, the statutory requirement that a § 364(c)(1) claim must be paid before all administrative expenses are paid precludes that § 364(c)(1) claim from also, simultaneously, being itself a kind or form of an administrative expense allowable under § 503(b)(1) of the Bankruptcy Code.

*Mayco Plastics*, 379 B.R. at 701–02. Although *Mayco Plastics* is factually distinguishable from this matter, the court finds the court's statutory analysis and rationale persuasive under these circumstances.[9]

In short, the court declines to read words or requirements into the statute that are not there. The priority of a claim under § 364(c)(1) is established under the statute when a court authorizes such priority due to a debtor's inability to obtain unsecured credit on an administrative expense priority basis under § 364(a) or (b). Application of the statute by its terms does not lead to absurd results. Accordingly, the court is not required to find the fee was a necessary expense which actually benefitted the estate. Plainly stated, the Committee's administrative expense argument was a time-consuming foray under the wrong legal standard and does not support its turnover motion.

**B. The Commitment Fee is Protected Under § 364(e)**

██ BofA argues that the commitment fee is protected under § 364(e) because the interim order, by its very terms, incorporates the protection offered under the statute. (Interim Order ¶ 26.) Section 364(e) provides:

The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

It is well-settled that the overall policy behind § 364 is to encourage lenders to provide financing to debtors by offering them incentives for their risk taking. *Burchinal v. Cent. Wash. Bank (In re Adams Apple, Inc.)*, 829 F.2d 1484, 1488 (9th Cir.1987).

The Committee argues that the safe harbor of § 364(e) is applicable only to appeals. This argument arises from the words of the statute, but that limitation in the context of this motion is refuted by two circumstances. First, the policy behind § 364(e) strongly implicates its applicability when the order in question is challenged in the bankruptcy court after the lender has relied on the order's protections. Second, the incorporation of the language of § 364(e) into the interim order has the effect of making that protection part of the relief ordered by the court such that it applies pre-appeal.

Lenders who deal with debtors and request and receive court approval for interim financing arrangements rely on provisions contained in interim orders just as they would rely on provisions contained in

---

9. In *Mayco Plastics*, the issue was whether a postpetition lender with a priority claim under § 364(c)(1) also had standing as an administrative expense claimant for purposes of objecting to the debtor's plan under § 1129(a)(9).

a final, appealable order. *Adams Apple,* 829 F.2d at 1489 (noting that the policies behind § 364(e) indicate that a claim is moot as soon as a lender has relied on the authorization). Accordingly, lenders commonly seek, and obtain, § 364(e) protection for transactions in court-approved interim orders. Under these circumstances, to allow an interim financing order which is non-modifiable on its face to be modified subsequent to its issuance is inconsistent with the protection given to BofA as a DIP lender under § 364(e). Put simply, § 364(e) would offer little incentive to lenders if its protection was limited only to appeals since the bankruptcy court's modification of its own orders during the interim period "poses the same risks as does reversal on appeal." See *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting (In re Kham & Nate's Shoes No. 2, Inc.),* 908 F.2d 1351, 1355 (7th Cir.1990); *see also, Vafer Inv. Group, LLC v. Case (In re Visionaire Corp.),* 299 B.R. 530, 535 (8th Cir. BAP 2003)(finding that it would an abuse of discretion if the bankruptcy court modified interim financing order after lender made advances during interim period but noting that lender was not protected for advances once interim period expired without final order).

The court concludes that the fee falls squarely within the meaning of § 364(e). In this circuit, the law is settled that § 364(e) "broadly protects any requirement or obligation that was part of a postpetition creditor's agreement to finance ... and therefore any agreements or conditions necessary to obtain that credit were protected by § 364(e)." *Weinstein v. Gill (In re Cooper Commons, LLC),* 430 F.3d 1215, 1219 (9th Cir.2005); *see Adams Apple,* 829 F.2d 1484.

In *Adams Apple,* the Ninth Circuit provided guidance for determining whether a particular provision falls within the meaning of § 364(e). Creditors appealed the district court's affirmance of the bankruptcy court's authorization of a financing order that contained a cross-collateralization clause. Before reaching the merits of the cross-collateralization issue, the Ninth Circuit considered whether the appeal was statutorily moot under § 364(e) by examining the plain language of the statute and the policy behind it. The court found that reversal or modification of the cross-collateralization clause would affect the "validity of the debt" within the meaning of § 364(e). Moreover, the court construed the statute to align with congressional intent, viz that it was "designed to overcome a good faith lender's reluctance to extend financing in a bankruptcy context by permitting reliance on a bankruptcy judge's authorization." *Adams Apple,* 829 F.2d at 1488.

In including cross-collateralization clauses within the protection of § 364(e), the court recognized that a lender's reliance on a court's order approving such clauses in connection with postpetition DIP financing was paramount. Thus, *Adams Apple* teaches that a lender is entitled as a matter of law to rely on a bankruptcy court's financing orders, unless shown to act in bad faith.

The court concludes that the analysis and rationale set forth in *Adams Apple* applies with equal force to interim financing orders. The Committee seeks to undo a requirement and precondition of the financing. Here, the good faith of BofA is not at issue. Moreover, there can be little dispute about BofA's reliance. The evidence before the court showed that the financing offered by BofA was the "only deal" debtors could obtain and that the terms, including the up-front payment of the commitment fee, were heavily negotiated. Undoubtedly, the fee was an integral part of the bargained-for consideration for BofA to provide the financing.

Accordingly, the court finds that ordering turnover of the commitment fee would affect the "priority so granted" within the meaning of § 364(e). Further, this case does not simply involve BofA's reluctance to extend financing, but its outright refusal, when queried by the court, to extend credit without an up-front payment of the commitment fee. In reality, there would be no financing unless the commitment fee was paid immediately and in conjunction with the interim order. Thus, the circumstances of this case offer a compelling reason to uphold the policy under § 364(e) which is to protect a lender by allowing it to rely on the court's authorization of bargained-for terms.

■ In addition to this policy consideration, the exact language in ¶ 26 of the interim order compels the prohibition on modification by the bankruptcy court:

Any stay, modification, reversal, or vacatur of this Interim Order shall not affect the validity of any Postpetition Obligations outstanding immediately prior to the effective time of such stay, modification or vacatur, or the validity or enforceability of any Lien, priority, right, privilege or benefit authorized hereby with respect to any such Postpetition Obligations. Notwithstanding any such stay, modification or vacatur, any postpetition Obligations outstanding immediately prior to the effective time of such modification, stay or vacatur shall be governed in all respects by the original provisions of this Interim Order, and the Postpetition Agent and the DIP Lenders shall be entitled to all of the rights, privilege and benefits, including, without limitation, the Liens and priorities granted herein, with respect to all such Postpetition Obligations.

These sentences, standing alone, make no reference to an appeal and their only purpose is to provide the anti-modification protections in the bankruptcy court.

The Committee argues that there was no indication at the hearings on the interim financing or in the interim order itself that *the court* intended the commitment fee to be "earned on receipt" or otherwise nonrefundable regardless of whether the proposed DIP financing materialized for the benefit of the estate. However, this argument misses the mark because it is not the court's intent that controls, but the agreement between the parties. At the hearing, BofA stated it was the lenders' position that, under the contract, the commitment fee was earned once they made the funds available. *See In re Arlington Hospitality, Inc.,* 368 B.R. 702, 713 (Bankr.N.D.Ill.2007)(noting that the court's role is to approve the agreement presented and that it is the agreement, not the order approving it, that is the contract). Commitment fee provisions have been enforced under the same theory advanced by BofA. *See The Matter of Four Seasons Nursing Ctrs. of Am., Inc.,* 483 F.2d 599, 603 (10th Cir.1973)(holding that commitment fee was fixed and fully earned when loan commitment agreement was signed and fact debtor did not borrow full amount was of no consequence).

The Committee also argues that § 364(e) protection should not be afforded to postpetition lenders in the absence of significant postpetition financing.[10] (Reply Br. 7:13–25; 8:1–3). This argument is a red-herring because turnover of the commitment fee involves a narrow issue which does not require this court to decide whether a lender is protected under

---

**10.** BofA contends that throughout the interim period, the lenders advanced funds under the terms of the DIP loan as authorized by the interim order. The Committee disputes this contention and asserts that the DIP lenders did not advance a single dollar to debtors under the proposed DIP financing.

§ 364(e) as to money it did, or did not, disburse. Further, *Adams Apple* instructs the court to focus on the particular provision at hand to determine whether it fits within the scope of § 364(e). *Adams Apple*, 829 F.2d at 1486, 1489 (finding appeal moot even though post-petition lender advanced $450,000 of a $775,000 credit line). Accordingly, the actual amount of the financing extended before debtor decided not to proceed with additional financing does not enter into the equation under these circumstances.[11]

Additionally, there are no allegations that BofA was not ready, willing and able to loan the amount of funds authorized under the interim order. Rather, through no fault of BofA, debtors decided not to borrow past the interim period. Simply put, BofA performed its part of the bargain and requiring it to now turn over the fee runs afoul of § 364(e)'s policy of protecting lenders who offer financing on terms authorized by the bankruptcy court.[12] *Cf. In re The Korea Chosun Daily Times, Inc.*, 337 B.R. 773, 778–81 (Bankr.E.D.N.Y.2005)(finding that debtor's failure to close postpetition loan that was approved by court triggered lender's right to commitment fee and payment of reasonable expenses when it was a term of the underlying agreement and lender was not at fault).

In sum, the court holds that § 364(e) protects the commitment fee.

**C. Modification of the Interim Order is not Appropriate Under Fed. R. Civ. Proc. 60(b)(6) or § 105(a)**

The court now considers whether modification of the interim order under Fed. R. Civ. Proc. 60(b)(6) or § 105(a) is appropriate.

Fed.R.Civ.P. 60(b)(6) applies by its terms only to final orders.[13] Bankruptcy courts have taken a pragmatic approach to finality. *Elliott v. Four Seasons Props. (In re Frontier Props., Inc.)*, 979 F.2d 1358, 1363 (9th Cir.1992). "This 'pragmatic approach' to finality in bankruptcy focuses on whether the decision appealed from 'effectively determined the outcome of the case.'" *Id.* In *Frontier Properties*, the Ninth Circuit held that a bankruptcy order is appealable where it 1) resolves and seriously affects substantive rights and 2) finally determines the discrete issue to which it is addressed. *Id.* In *Wiersma*, the Ninth Circuit explained further that an order is final if it "constitutes a complete adjudication of the issues and clearly evidences the judge's intention it be final." *Wiersma v. Bank of the West (In re Wiersma)*, 483 F.3d 933, 938 (9th Cir.2007).

Here, the court concludes the test for finality is easily met. The interim order resolved and seriously affected the

---

**11.** It also is an immaterial argument, as the Committee bases its argument on the requirements of § 503(b) administrative priority, not required here as discussed above.

**12.** It goes without saying that § 364(e) would not protect BofA had it backed out of the financing. Rather, BofA would not have been entitled to keep the commitment fee under a contract analysis. *Arlington Hospitality*, 368 B.R. at 720 (noting that financing orders under § 364 approve financing agreements, but when it comes to enforcing those orders contractual principles apply).

**13.** At the December 16, 2009 hearing, the Committee asserted for the first time that ¶ 18 of the September 10, 2009 cash collateral order stated that the parties agreed the interim order was not final. This assertion was incorrect and misleading. The language of ¶ 18 very clearly provided that nothing in the September 10 order would have any effect on whether the interim order was final and preserved the rights of both the Committee and BofA to argue about the finality of that order in this turnover motion. The tactics of the Committee in raising this meritless argument at the hearing are questionable advocacy.

substantive rights of the parties with respect to the availability and advancement of credit during the interim period. Each of the discrete issues, including debtors' upfront payment of the commitment fee and its superpriority status under § 364(c)(1), were finally determined. Additionally, the court evinced the finality of the order when, in approving the financing, it stated that some aspects of the order were irreversible and what might be modified at the time of the final order would be any additional lending made by BofA. (Tr. 29:10–24, March 31, 2009). Thus, Fed.R.Civ.P. 60(b)(6) applies.

Courts in this circuit have been instructed that Fed.R.Civ.P. 60(b)(6) "should be 'used sparingly as an equitable remedy to prevent manifest injustice' and 'is to be utilized only where extraordinary circumstances prevented a party from taking timely action to prevent or correct an erroneous judgment.' " *United States v. Wash.*, 394 F.3d 1152, 1157 (9th Cir.2005). Further, although courts are given wide discretion to reconsider their orders under Fed.R.Civ.P. 60(b), their discretion is limited to those circumstances were no intervening rights have vested in reliance on the order. *Zurich Am. Ins. Co. v. Int'l Fibercom, Inc. (In re Int'l Fibercom, Inc.),* 503 F.3d 933, 941 (9th Cir.2007). "Accordingly, a party who moves for such relief 'must demonstrate both injury and circumstances beyond his control that prevented him from proceeding with . . . the action in a proper fashion.' " *Id.*

Here, the court finds the facts of this case do not justify relieving the Committee from the provisions in the interim order which exhibited finality. The equities clearly weigh in favor of BofA. Though hindsight revealed that the interim financing may have been unnecessary to the preservation of debtors' estate, this was not the fault of BofA, which maintained all its obligations throughout the interim period. The court observes that debtors could have bargained for a refundable fee, but they did not.[14] Thus, the court does not perceive a manifest injustice will result by upholding the fee when BofA performed under the agreement.

Furthermore, having found § 364(e) protects the commitment fee, it would be inappropriate to allow modification of the interim order when BofA's rights have vested in reliance on the order. *Int'l Fibercom,* 503 F.3d at 941.

Finally, while it goes without saying that unsecured creditors suffer an injury when estate funds are paid to higher priority creditors, the Committee has not demonstrated circumstances beyond its control that prevented it from filing an appeal. The circumstances actually suggest otherwise. First, BofA made clear that the fee was a non-negotiable point in extending DIP postpetition financing. Second, the court expressed its view on the record that its decision approving the commitment fee could not later be undone. Next, the interim order made its provisions "effective as of the date of signature by the Court." (Interim Order ¶ 32) Thus, upon issuance, the order itself triggered the Committee's obligation to, at minimum, immediately seek a stay. Last, although the Committee contends that it reserved its rights, reserving rights on the record alone does not toll the time for filing an appeal.[15]

---

14. At least, not successfully.

15. The court also observes that the assertion by the Committee that it "reserved its rights" is disingenuous on this record. The court recessed the initial hearing on March 26, 2009 for the express purpose of giving the Committee the opportunity to bargain for a broad reservation of rights with BofA. The transcript of the March 27, 2009 hearing makes it clear the Committee was unsuccessful in achieving any such reservation pertaining to the commitment fee.

Accordingly, for all these reasons, the court concludes that relief under Fed. R.Civ.P. 60(b)(6) is not available.

■ Nor is the Committee entitled to relief under § 105(a). Section 105(a) authorizes bankruptcy courts to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." Relief under § 105(a) complements that under Fed.R.Civ.P. 60(b). *Int'l Fibercom*, 503 F.3d at 940. But that power cannot be used to circumvent the requirements of Fed.R.Civ.P. 60(b) or other clear statutory language. *Missoula Fed. Credit Union v. Reinertson (In re Reinertson)*, 241 B.R. 451, 456 (9th Cir. BAP 1999).

Even if the interim order was not a final order, the balance of equities in this case do not support a modification of the interim order under § 105(a).

## III. CONCLUSION

For the reasons stated above, the court denies the Committee's motion.

This Memorandum Decision constitutes findings of fact and conclusions of law under Federal Rule of Bankruptcy Procedure 7052. Counsel for BofA is directed to file with this Court an order in conformance with this Opinion within ten (10) days from the date of the entry hereof.