FILED

JUN 05 2012

SUSAN M SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

NOT FOR PUBLICATION

## UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: | BAP No. CC-10-1137-KiPaD |
| FLEETWOOD ENTERPRISES, INC., ET AL., | Bk. No. 09-14254-MAJ |
| Debtors. | |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS, | |
| Appellant, | |
| v. | **M E M O R A N D U M**[1] |
| BANK OF AMERICA, N.A., | |
| Appellee. | |

Argued and Submitted on January 21, 2011
at Pasadena, California

Filed - June 5, 2012

Appeal from the United States Bankruptcy Court
for the Central District of California

Honorable Meredith A. Jury, Bankruptcy Judge, Presiding

_____

Appearances:     Michael Schatzow of Venable LLP argued for
Appellant Official Committee of Unsecured
Creditors; Wayne S. Flick of Latham & Watkins LLP
argued for Appellee Bank of America N.A.

_____

Before: KIRSCHER, PAPPAS, and DUNN, Bankruptcy Judges.

_____

[1] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

Appellant, the Official Committee of Creditors Holding Unsecured Claims ("Committee"), appeals an order from the bankruptcy court denying the turnover of a commitment fee paid to appellee, Bank of America, N.A. ("BofA"), administrative agent for the lenders ("Lenders"), in connection with a postpetition financing agreement.  We AFFIRM.

## I. FACTS AND PROCEDURAL BACKGROUND

Fleetwood Enterprises, Inc. ("FEI") and its affiliates (collectively "Debtors") each filed a voluntary chapter 11[2] petition on March 10, 2009.  Thereafter, Debtors acted as debtors-in-possession ("DIP") pursuant to §§ 1107 and 1108.  The Committee was appointed on March 19, 2009.

Prior to filing bankruptcy, FEI and certain direct or indirect subsidiaries were parties to a prepetition secured credit facility with a syndicate of lenders led by agent BofA. As of the petition date, the outstanding amount of the prepetition facility was approximately $60 million, which (a) consisted entirely of the Lenders' contingent liability on issued and outstanding letters of credit, and (b) was secured by prepetition collateral with an aggregate value of $156 million that consisted of cash collateral, accounts receivable, real estate, and other collateral.

On March 24, 2009, Debtors filed a Motion for Entry of Interim and Final Orders (1) Authorizing Debtors to Obtain

---

[2] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532. The Federal Rules of Bankruptcy Procedure, Rules 1001-9037, are referred to as "Rules."  The Federal Rules of Civil Procedure are referred to as "Civil Rules."

Postpetition Secured Financing, (2) Authorizing the Use of Cash Collateral, (3) Granting Liens and Superpriority Claims, (4) Modifying the Automatic Stay, and (5) Setting Final Hearing ("DIP Motion"), in which Debtors sought the approval of the bankruptcy court to enter into a secured credit agreement with Lenders ("DIP Credit Agreement") pursuant to § 364(c). Lenders agreed to lend Debtors an amount not to exceed $80 million, including a $65 million sub-limit for existing letters of credit. Under the DIP Credit Agreement, Debtors were obligated to pay a $2.4 million commitment fee ("Commitment Fee") to Lenders.

In the DIP Motion, Debtors contended that postpetition financing was necessary in order to continue operations and to administer and preserve and maintain the value of their estates. Without the funds, Debtors would be forced to cease operations, which would likely (1) result in irreparable harm to their business, (2) deplete going concern value, and (3) jeopardize the Debtors' ability to reorganize and maximize value. Debtors asserted that they had engaged in extensive, good faith arm's-length negotiations with Lenders regarding the terms and conditions of the DIP Credit Agreement, which they believed in their sound business judgment were fair and reasonable. Specifically, Debtors' CFO testified that the DIP Credit Agreement had been in the works for several weeks before Debtors filed bankruptcy and, given the current economic environment and lack of alternatives, the DIP Credit Agreement was the best deal possible for Debtors in order to maintain their businesses and search for buyers.

Due to Debtors' urgent need for access to funds, the

bankruptcy court held three expedited hearings on the DIP Motion on March 26, 27, and 31, 2009. At the Thursday, March 26 hearing, Debtors again asserted that the financing they sought to be approved on an interim basis was not just the best deal they could find, but the only deal. The Committee objected to the DIP Motion, contending, inter alia, that the $2.4 million Commitment Fee was "outrageous," and requested that any interim order include an absolute reservation of rights for the Committee. In response, the bankruptcy court stated that it was prepared to grant the DIP Motion on an interim basis, but it wanted the parties to prepare a form of order that reserved argument for everything not needed by Sunday, March 29.

Unable to reach any resolution on certain issues, the parties appeared before the bankruptcy court again on Friday, March 27. Lenders' counsel informed the bankruptcy court that the Committee and Deutsche Bank[3] believed that the Commitment Fee issue should be reserved for the final hearing. Lenders' counsel also indicated that before Lenders would proceed with interim DIP financing, they needed to know the rights and protections under which they were operating. Hr'g Tr. 4:7-8, 18-20, Mar. 27, 2009 ("Mar. 27 Hr'g Tr."). In response, the court asked Lenders' counsel: "Is it your position that the commitment fees have to be paid before a final hearing?" Mar. 27 Hr'g Tr. 7:19-20. Lenders' counsel replied: "Your honor, it is. The view of our lender group is that they are making the commitment now. They

_____

[3] Deutsche Bank Trust Company Americas is indenture trustee for certain senior secured note holders whose claims are junior to those of the Lenders.

- 4 -

are agreeing that their capital will be set aside for these loans and as a result they should be entitled to the commitment fee when the commitment is actually made." Mar. 27 Hr'g Tr. 7:21-25. The Committee responded that a $2.4 million Commitment Fee seemed "obscenely high" for what was basically a $20 million facility. Mar. 27 Hr'g Tr. 13:15-19.

After much debate about various issues, Debtors reiterated that without the interim DIP financing they would be out of business by Monday morning, and even though the Commitment Fee seemed high, it provided Debtors with a much lower interest rate compared to the 20% rate plus $1 million commitment fee offered by other lenders, so it was a balance between the interest rate and the Commitment Fee. The court then observed that Lenders wanted at least two items they considered "nonnegotiable," one being the Commitment Fee. Considering that the Commitment Fee bought down the interest rate from 20% to about 8%, the court stated that the extra $1.4 million to buy down the interest rate to 8% was "certainly a reasonable price . . . . So I think I would order that." Mar. 27 Hr'g Tr. 36:5-12. In order to facilitate further negotiations among the parties, the court decided to extend the existing cash collateral order to prevent Debtors from shutting down and to continue the hearing on the DIP Motion until Tuesday, March 31, 2009.

At the March 31, 2009 hearing, the Committee's counsel expressed some confusion about what the court was determining on an interim basis and whether the Commitment Fee would be paid before or after the final hearing. However, the Committee's counsel acknowledged that at the March 27, 2009 hearing the court

had indicated its initial thoughts on the issue. When the Committee's counsel began discussing details about professional carve-outs and their treatment in a default situation, the bankruptcy court responded: "Why are we doing this detail about that type of thing in an interim order?" Hr'g Tr. 9:17-18, Mar. 31, 2009 ("Mar. 31 Hr'g Tr."). The Committee's counsel replied, "Because I asked for a general reservation of rights and I haven't gotten it." Mar. 31 Hr'g Tr. 9:22-23. The bankruptcy court then asked the Lenders' counsel if the 53-page proposed interim order could contain a provision reserving argument on certain items for the final order:

> I mean if – first of all, it is an interim order only. And I quite frankly think when I do anything interim, that I have the power to order something different as a final order. Although, certainly in, you know, fee settings, the Court has that. I think my interim order is only effective as to the date in which I have a final hearing . . . . So it seems to me that if it is a requirement of the lending group that they suddenly want their commitment fee up front – if they at the end of the day don't earn it, maybe we get it back but they get it up front?

Mar. 31 Hr'g Tr. 12:13-19; 12:24-13:3. The Lenders rejected the proposed reservation of rights provision. After much debate about the issue, the court asked the Committee's counsel to explain what "dire things" would happen if it approved the interim order "as-is," to which counsel responded: "Your honor, I guess it comes down to the issue of, what do we mean by an interim order?" Mar. 31 Hr'g Tr. 18:4-7, 16-17. To that statement, the court replied: "Yeah, I'm beginning to wonder myself." Mar. 31 Hr'g Tr. 18:18. The court then went on to explain:

> [I]f the agreement on the commitment fee is in order to

- 6 -

have this lending facility last more than 30 days, we pay them 2.4 million dollars. I have no problem paying 2.4 million dollars. If the 2.4 million dollars means, "we get that, but we can back out before the final order if we want to," then I'd have a problem with that. . . . [T]here are certain things in this interim order that I could not reverse in the final order is what I'm saying.

Mar. 31 Hr'g Tr. 19:9-14, 17-18. Nothing further was said about the Commitment Fee.

After hearing argument on issues not related to the Commitment Fee, the court announced:

Then I believe that I should approve the interim order, because I don't know that we have a lot of options to keep this Debtor operating past 4:00 o'clock today. <u>And, in that approval, what I perceive I am doing, that is irreversible</u>. As far as something that might be modified at the time of the final order, are those things that will protect the lending banks for any steps that they take during this interim period, such as advancing further advances . . . . <u>They get their commitment fee, and they – and anything else that essentially carries forth past the final hearing date</u>. . . . And that's really the intent of what an interim order is.

Mar. 31 Hr'g Tr. 29:10-18, 19-21, 23-24 (emphasis added). Although several parties made further statements on the record, the Committee was silent.

On April 1, 2009, the bankruptcy court entered an interim order granting the DIP Motion ("Interim DIP Order"). The Interim DIP Order authorized payment of the Commitment Fee to the Lenders as a superpriority administrative expense under § 364(c)(1). Paragraph 26 provided that the Interim DIP Order was entitled to the protections of § 364(e), and further stated:

Any stay, modification, reversal or vacatur of this Interim Order shall not affect the validity of any Postpetition Obligations outstanding immediately prior to the effective time of such stay, modification or vacatur . . . .

- 7 -

The Interim DIP Order set a final hearing on the DIP Motion for April 21, 2009, which was continued to April 29, 2009.

Interested parties had the opportunity to file objections prior to the final hearing. The Committee filed its objection on April 13, 2009 ("DIP Objection"). The Committee objected to, inter alia, payment of the Commitment Fee, contending that a $2.4 million fee bordered on "unconscionable." The Committee asserted that Debtors had yet to borrow a single dollar under the DIP Credit Agreement and really only $5 million was available to borrow under a "$20 million" facility. Therefore, Debtors had paid $2.4 million to potentially borrow $5 million. The Committee also asserted that the Commitment Fee was paid without any review or approval by the court as to its "reasonableness." Finally, the Committee contended that Debtors were able to operate on $26.8 million of cash collateral, which is what Debtors used to pay the Commitment Fee.

The DIP Objection was never heard because on April 29, 2009, Debtors filed a Motion for Entry of Interim and Final Orders (A) Authorizing Use of Cash Collateral and Providing for Adequate Protection, (B) Modifying the Automatic Stay, and (C) Scheduling a Final Hearing (the "Cash Collateral Motion"), in which Debtors withdrew the DIP Motion. The bankruptcy court in the recitals of its order of May 11, 2009, set forth that the final hearing on the Interim DIP Order was set for April 21, 2009, and was continued to April 29, 2009, on the motion of the Committee; that Debtors filed the emergency Cash Collateral Motion on April 29, 2009, and set the matter for hearing on April 29, 2009; that the Debtors withdrew their DIP Motion prior to the scheduled final

hearing, which motion had been the basis, in part, for the Interim DIP Order; and that the balance of the Interim DIP Order governing the use of cash collateral would remain in place after April 29, 2009, until a hearing could be held on May 13, 2009.[4]

In August 2009, the Debtors and the Committee stipulated to the Committee prosecuting various claims on behalf of Debtors' estates. On August 10, 2009, the bankruptcy court entered an order approving the stipulation ("August 2009 Stipulation"). The order provided that the Committee could pursue an action "to recover a $2.4 million commitment fee paid by the Debtors."

As for Debtors' Cash Collateral Motion, on September 10, 2009, the bankruptcy court entered a final order authorizing Debtors to use cash collateral until January 31, 2010 ("September 10 Order"). Paragraph 18 of the September 10 Order provides:

> [N]othing herein shall be deemed a waiver of the right of the Committee, whether acting on its own behalf or on behalf of the estates, to seek recovery of the $2.4 million commitment fee paid to the Secured Parties (the "Commitment Fee Issue"); provided, further that . . . (ii) except to the extent set forth herein, nothing herein shall render any of the provisions of the Interim DIP Order final (and in particular any provisions of the Interim DIP Order relating to the Commitment Fee Issue), it being the intent of the parties that the Commitment Fee Issue be reserved for future proceedings . . . .

On November 2, 2009, the Committee filed a Motion for

---

[4] In reaching our decision, the Panel has reviewed the bankruptcy court docket. See Clinton v. Deutsche Bank Nat'l Trust Co. (In re Clinton), 449 B.R. 79, 82-83 & n.5 (9th Cir. BAP 2011) (citing O'Rourke v. Seaboard Surety Co. (In re E.R. Fegert, Inc.), 887 F.2d 955, 957-58 (9th Cir. 1989) and indicating that an appellate court may take judicial notice of underlying bankruptcy court records).

- 9 -

Turnover of Property of the Estate ("Turnover Motion") in which the Committee sought turnover of the Commitment Fee Debtors paid Lenders under the Interim DIP Order.[5]  In sum, the Committee argued that because final financing never materialized, Debtors received no discernable benefit in exchange for the $2.4 million paid to Lenders.  Hence, the Committee asserted, the Commitment Fee was not entitled to administrative expense priority under § 503(b)(1)(A) because Lenders could not establish that it was an actual and necessary expense of Debtors' estates.  Specifically, the Committee contended that at no time during any of the interim DIP Motion hearings, or in the Interim DIP Order, did the court indicate an intention that the Commitment Fee was to be "earned on receipt" or was otherwise nonrefundable regardless of whether the DIP Credit Agreement materialized for the benefit of Debtors' estates.  Further, because the Interim DIP Order was an interim, rather than a final, order, the bankruptcy court was free to reexamine and modify it.  Alternatively, if the Interim DIP Order was a final order, the Committee believed it was subject to reexamination and modification under Civil Rule 60(b)(6), incorporated by Rule 9024.

Lenders opposed the Turnover Motion contending that no basis existed to require Lenders to turn over the Commitment Fee to

---

[5] Section 542(a) provides in relevant part:

Except as provided in subsection (c) or (d) of this section, an entity . . . in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property . . . .

Debtors. Lenders argued that the Commitment Fee was thoroughly considered at each of the three hearings on the DIP Motion, and based on the evidentiary record presented, which the Committee never challenged, the court found that it supported payment of the Commitment Fee and entry of the Interim DIP Order. The Commitment Fee was an express precondition to the Lenders' agreement to extend financing, and payment of the earned Commitment Fee as an administrative expense was an explicit provision of the Interim DIP Order on which Lenders relied. Lenders also contended that the express language in ¶ 26 of the Interim DIP Order, in conjunction with the order's good-faith finding under § 364(e), precluded the Committee's requested relief. Finally, Lenders asserted that the Interim DIP Order was a final order, and the Committee was improperly invoking Rule 9024 as a substitute for an untimely appeal. Contrary to the Committee's contentions, Lenders represented that the Commitment Fee was charged against Debtors' account on April 1, 2009, and that Debtors utilized the funds before they withdrew their DIP Motion.

The bankruptcy court held a hearing on the Turnover Motion on December 16, 2009. Before taking argument from the parties, the court announced that it had tentatively decided the Turnover Motion should be denied, but noted that, in all fairness, the Commitment Fee resulted in a windfall to Lenders. The court then went on the explain how the Committee could have misunderstood its ruling on the Commitment Fee at the March 31, 2009 hearing because of the way the record had been transcribed, and proceeded to clarify:

- 11 -

What I was trying to say and I certainly didn't articulate it particularly well is I thought there were two discreet things that I had to be making essentially a final ruling on at the time of that hearing. . . . The second part of it was a commitment fee because it had been made very clear to me in the colloquy that I had with the bank's counsel that the lenders were committing and they were committing at that time, . . . and if they didn't get their commitment fee for committing, there would be not only no interim financing.[sic]  There would be no final financing and that was a non-negotiable position of the lenders and that was very clear.

So when I made that ruling I expected those two parts of the ruling to be final.  It is possible for an order which is called an interim order to be a final order under the flexible finality standards of the [N]inth [C]ircuit. . . .

. . . I made a decision that was final on that [discrete] issue of the commitment fee. . . .  I do think that the order that the Court made at that time – even in  the interim order was the final order was [sic] not appealed.

Hr'g Tr. 6:3-7:10, Dec. 16, 2009 ("Dec. 16 Hr'g Tr.").  After hearing argument from the parties, the court retreated from its tentative ruling in favor of Lenders and decided to take the matter under submission.  Dec. 16 Hr'g Tr. 37:24-25.

On April 8, 2010, the bankruptcy court issued its decision denying the Turnover Motion ("Turnover Decision").  In re Fleetwood Enters., 427 B.R. 852 (Bankr. C.D. Cal. 2010).  The bankruptcy court concluded that the Interim DIP Order was a final order that was not timely appealed, and the Committee provided no basis for relief from that order under either § 105(a)[6] or

---

[6] Section 105(a) provides that the bankruptcy court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.  No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process."

Rule 9024, incorporating Civil Rule 60. Further, based upon the plain language of § 364(c)(1), which allowed the Commitment Fee superpriority status, the bankruptcy court concluded that it was not required to also find that the Commitment Fee was a necessary expense that benefitted the estate under § 503(b)(1)(A). Finally, the court determined that it was precluded from ordering turnover of the Commitment Fee because of the "safe harbor" provision of § 364(e) and the protective language provided in ¶ 26 of the Interim DIP Order. The court entered an order in accordance with its Turnover Decision on April 21, 2010 ("Turnover Order"). The Committee timely appealed that order.

## II. JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 157(b)(2)(D) and 1334. We have jurisdiction under 28 U.S.C. § 158.

## III. ISSUES

Did the bankruptcy court err in denying the Committee's Turnover Motion.

## IV. STANDARD OF REVIEW

The bankruptcy court's conclusions of law are reviewed de novo, and its findings of fact are reviewed for clear error. Nichols v. Birdsell, 491 F.3d 987, 989 (9th Cir. 2007). Whether property is included in a bankruptcy estate and the procedures for recovering estate property are questions of law that we review de novo. White v. Brown (In re White), 389 B.R. 693, 698 (9th Cir. BAP 2008).

We review a bankruptcy court's interpretation of its own order for an abuse of discretion. Arenson v. Chicago Mercantile

- 13 -

Exch., 520 F.2d 722, 725 (7th Cir. 1975). "'We owe substantial deference to the bankruptcy court's interpretation of its own orders and will not overturn that interpretation unless we are convinced that it amounts to an abuse of discretion.'" Marciano v. Fahs (In re Marciano), 459 B.R. 27, 35 (9th Cir. BAP 2011) (quoting Ill. Inv. Trust No. 92 7163 v. Allied Waste Indus., Inc. (In re Resource Tech. Corp.), 624 F.3d 376, 386 (7th Cir. 2010); see also Bass v. First Pac. Networks, Inc., 79 F.3d 1152 at *1 n.1 (9th Cir. 1996)(unpublished decision); Rogers v. Alaska Steamship Co., 290 F.2d 116, 123 (9th Cir. 1961).

In applying an abuse of discretion test, we first "determine de novo whether the [bankruptcy] court identified the correct legal rule to apply to the relief requested." United States v. Hinkson, 585 F.3d 1247, 1262 (9th Cir. 2009)(en banc). If the bankruptcy court identified the correct legal rule, we then determine whether its "application of the correct legal standard [to the facts] was (1) illogical, (2)implausible, or (3) without support in inferences that may be drawn from the facts in the record." Id. (internal quotation marks omitted). If the bankruptcy court did not identify the correct legal rule, or its application of the correct legal standard to the facts was illogical, implausible, or without support in inferences that may be drawn from the facts in the record, then the bankruptcy court has abused its discretion. Id. The decision of the bankruptcy court will not be reversed for harmless error. Va Bene Trist, LLC v. Wash. Mut. Bank (In re Va Bene Trist, LLC), 2012 WL 37346 *1 (D. Ariz. Jan. 9, 2012).

## V. DISCUSSION

The Committee, on behalf of Debtors' estates, filed its Turnover Motion to recover the Commitment Fee pursuant to § 542. Section 542 requires persons "in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease, . . ." to "deliver to the trustee, and account for, such property or the value of such property."

To satisfy these three factors, the Committee must demonstrate that: (1) the Commitment Fee is or was in the Lenders' possession, custody, or control during the pendency of the case; (2) the Commitment Fee could be used by the Debtors; and (3) the Commitment Fee has more than inconsequential value or benefit to the estate. Bailey v. Suhar (In re Bailey), 380 B.R. 486, 490 (6th Cir. BAP 2008). The Committee failed to satisfy the first factor for the following reason. "[I]f an entity has previously obtained a bankruptcy court order authorizing it to retain the property in question, [§] 542(a) will not require turnover of the property." 5 COLLIER ON BANKRUPTCY ¶ 542.02 (Alan N. Resnick & Henry J. Sommer, eds., 16th ed. 2011) (citing 124 Cong. Rec. H11096-97 (daily ed. Sept. 28, 1978); S17413 (daily ed. Oct. 6, 1978) (remarks of Rep. Edwards and Sen. DeConcini)).[7] Although the other two factors: (1) beneficial use; and (2) consequential value, are apparent,

---

[7] COLLIER cites to the Daily Edition (temporary) and not to the bound edition of the Congressional Record (permanent). The permanent citation is 124 Cong. Rec. 32399-32400 and 33999 (1978) (remarks of Rep. Edwards and Sen. DeConcini) ("This section is not intended to require an entity to deliver property to the trustee if such entity has obtained an order of the court authorizing the entity to retain possession, custody, or control of the property.").

the statute requires conjunctive proof of all three factors. As to the first factor, Lenders received the Commitment Fee pursuant to the Interim DIP Order issued after evidentiary hearings. Pursuant to the Interim DIP Order, Lenders earned the Commitment Fee and disbursed money on the Closing Date to Debtors. See In re Four Seasons Nursing Ctrs. of Am., Inc., 483 F.2d 599, 603 (10th Cir. 1973).

In a cursory analysis of the § 542(a) factors, one might believe that all factors were satisfied. The Commitment Fee was paid to the Lenders; so, it is in the possession of the Lenders, could have been used by Debtors and has consequential value to the estate. If such analysis is applied, one might be distracted with whether the Interim DIP Order is the order on appeal and whether it was the final order from which a timely appeal was not filed, thereby warranting a dismissal of this appeal on jurisdictional grounds.

A more thorough analysis is, however, required. As explained above, entities that receive property from a debtor pursuant to a court authorized transfer will not be required to turn over the property for the benefit of the bankruptcy estate, unless such prior authorization is determined to be inappropriate for some legal or factual reason. In this instance, the Committee, in order to prevail on its motion, needed the bankruptcy court to reexamine the Interim DIP Order authorizing the payment of the Commitment Fee to determine if it was inappropriately approved. The bankruptcy court, in considering the Turnover Motion, needed necessarily to review its Interim DIP Order and determine if it required modification to provide the

- 16 -

basis for the turnover of the Commitment Fee. In considering the bankruptcy court's review of its orders, we will follow the established standard of review. "We owe substantial deference to the bankruptcy court's interpretation of its own orders and will not overturn that interpretation unless we are convinced that it amounts to an abuse of discretion." Marciano v. Fahs (In re Marciano), 459 B.R. at 35 (quoting Ill. Inv. Trust No. 92 7163 v. Allied Waste Indus., Inc. (In re Resource Tech. Corp.), 624 F.3d at 386); see also Bass v. First Pac. Networks, Inc., 79 F.3d 1152 at *1 n.1; Rogers v. Alaska Steamship Co., 290 F.2d at 123.

What bases exist to determine that the Interim DIP Order inappropriately authorized Lenders to receive payment of the Commitment Fee and that they should be required to turn over the Commitment Fee in accordance with the first factor of § 542(a)? The Committee argues on appeal that (1) the Interim DIP Order is not a final order; (2) Lenders have failed to establish administrative expense priority for the Commitment Fee; and (3) the Commitment Fee is not protected by § 364(e).

**A. Whether The Interim DIP Order Is A Final Or An Interlocutory Order Is Not Determinative.**

In considering the Turnover Motion, the bankruptcy court reviewed its prior Interim DIP Order issued based upon its analysis of the evidence and pursuant to the requirements of § 364. The bankruptcy court concluded, given the balance of equities, that modification or reconsideration of the Interim DIP Order was not warranted for the purposes of granting a turnover of the Commitment Fee. "As we owe substantial deference to the bankruptcy court's interpretation of its own orders, we will not

- 17 -

overturn that interpretation unless we are convinced that it amounts to an abuse of discretion." In re Marciano, 459 B.R. at 35. The record on appeal establishes that the bankruptcy court carefully reviewed the requirements of § 364 and the evidence used to support its Interim DIP Order and concluded that Debtors needed the interim credit facility or risked going out of business; concluded that the DIP Credit Agreement provided the most viable lending package in comparison to other alternative credit facilities, if any; and concluded that Lenders had the financial means to perform under the DIP Credit Agreement authorized by the Interim DIP Order and did perform on the Closing Date after being paid the Commitment Fee upon the signing of the DIP Credit Agreement. None of this evidence is in dispute.

The bankruptcy court considered paragraph 26 of the Interim DIP Order, and alternatively reasoned, even if it narrowly construed § 364(e) as protecting postpetition lenders from reversal or modification of a bankruptcy court's financing orders on appeal and not from a bankruptcy court's subsequent reversal or modification of its own orders, it was precluded from disturbing the Interim DIP Order because the language in ¶ 26 provided essentially the same protections to Lenders as did § 364(e). In re Fleetwood Servs., 427 B.R. at 861. Although under § 105 or under Civil Rule 60(b) a court may modify an order to clarify its meaning, that authority is limited by the interests of justice, and whether parties may be restored to their prior positions. See Zurich Am. Ins. Co. v. Int'l Fibercom, Inc. (In re Fibercom, Inc.), 503 F.3d 933, 940

- 18 -

(9th Cir. 2007) (citing Meyer v. Lenox (In re Lenox), 902 F.2d 737, 740 (9th Cir. 1990). This power is further limited because a court may not remove a material part of an agreement over the objection of one of the parties and order the balance of the agreement enforced. A & A Sign Co. v. Maughan, 419 F.2d 1152, 1155 (9th Cir. 1969). The bankruptcy court made findings that Lenders' good faith was not in question, both in the Interim DIP Order and the Turnover Decision. In re Fleetwood Servs., 427 B.R. at 860. In order to grant the Turnover Motion the bankruptcy court would have had to modify the Interim DIP Order, which in turn would have altered the DIP Credit Agreement, thereby modifying a material part of the agreement between Debtors and Lenders after performance of the terms of the DIP Credit Agreement had been completed in accordance to the Interim DIP Order. Consequently, based on the other facts established during the interim hearings, no other bases existed upon which the bankruptcy court could modify the Interim DIP Order. We conclude the bankruptcy court applied the correct legal standard and its fact finding is not illogical, implausible or without support in inferences that may be drawn from the facts in the record. The bankruptcy court's analysis of the law and its proper application of the law to the facts does not warrant the modification of the Interim DIP Order urged by the Committee, pursuant to the power authorized under § 105(a). The Committee fails to satisfy the first factor of § 542(a).

///

///

///

- 19 -

**B.** **The Bankruptcy Court Did Not Err When It Determined That It Was Not Required To Find That The Commitment Fee Was A Necessary Expense That Benefitted The Estates Under § 503(b)(1)(A).**

The Interim DIP Order provided that fees incurred in connection with the DIP financing, including the Commitment Fee, would be paid on a superpriority basis under § 364(c)(1). Specifically, ¶ 9(c), entitled "Superpriority Claims," provides in relevant part:

> All Postpetition Obligations [including the Commitment Fee], subject only to the Carve-Out, hereby constitute under Section 364(c)(1) allowed superpriority administrative expense claims . . . .

If a debtor is unable to obtain an unsecured loan by providing an administrative expense priority under § 364(b),[8] under § 364(c) the court may authorize the DIP to obtain credit or incur postpetition debt entitled to a "superpriority" claim over all administrative expense claims specified in § 503(b) (administrative expenses) or § 507(b) (other superpriority administrative claims for failed adequate protection). See § 364(c)(1).[9] The term "superpriority" is not found in the

[8] Section 364(b) provides:

The court, after notice and a hearing, may authorize the trustee to obtain unsecured credit or to incur unsecured debt other than under subsection (a) of this section, allowable under section 503(b)(1) of this title as an administrative expense.

[9] Section 364(c)(1) provides:

If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) . . . as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b). . . .

- 20 -

Bankruptcy Code; however, it is frequently used to identify the priority conferred by § 364(c)(1) over administrative expense claims. In re Mayco Plastics, Inc., 379 B.R. 691, 701-02 (Bankr. E.D. Mich. 2008).

In its Turnover Motion, the Committee contended that, although the Interim DIP Order authorized Debtors to pay the Commitment Fee as an administrative expense, Lenders had not established an administrative expense priority for the Commitment Fee under § 503(b)(1)(A). Specifically, the Committee contended that Lenders could not establish an administrative expense claim for the Commitment Fee because the proposed DIP financing was never necessary, it never materialized, and Lenders never advanced a single dollar to Debtors under the DIP Credit Agreement. In short, it argues that Lenders had not shown that payment of the Commitment Fee directly and substantially benefitted the estates. Notably, the Committee never raised this issue at any of the interim DIP Motion hearings.

Section 503(b)(1)(A) allows postpetition administrative expenses for "the actual, necessary costs and expenses of preserving the estate." Einstein/Noah Bagel Corp. v. Smith (In re BCE West, L.P.), 319 F.3d 1166, 1172 (9th Cir. 2003). The burden of proving an administrative expense claim under § 503(b)(1)(A) is on the claimant. Id. To establish such a claim, the claimant must show that the debt: (1) arose from a transaction with the DIP; and (2) directly and substantially benefitted the estate. Id. The terms "actual" and "necessary" are construed narrowly in order to keep fees and administrative costs at a minimum. Burlington N.R.R. Co. v. Dant & Russell,

- 21 -

Inc. (In re Dant & Russell, Inc.), 853 F.2d 700, 706 (9th Cir. 1988).

Lenders argue that the Commitment Fee directly and substantially benefitted Debtors' estates by providing access to the DIP loan to borrow funds during the interim period. Plus, the commitment of Lenders to provide DIP financing in and of itself conferred a direct and substantial benefit on Debtors' estates during the interim period irrespective of whether Debtors ultimately decided to proceed with the financing. As reflected in the testimony of Debtors' CFO submitted in support of the DIP Motion, the availability of interim DIP financing (1) would provide Debtors with immediate and ongoing access to borrowing availability to pay their current and ongoing operating expenses, including postpetition wages, utilities, and vendor costs, (2) would necessarily provide confidence to Debtors' creditors in order to encourage continued relationships, and (3) would be viewed favorably by Debtors' vendors, employees and customers, and assure these parties of Debtors' ability to meet their near-term obligations, thereby promoting a successful reorganization. Debtors' CFO further testified that without the interim DIP financing, Debtors would be unable to meet their obligations, which would have a long-term negative impact on the value of Debtors' businesses, and would result in accelerated cash demands on the Debtors. The Committee offered no evidence or arguments challenging this testimony. Additionally, Lenders argued, at the interim hearings on the DIP Motion, that Debtors established the critical need for the DIP financing for the businesses and that they would cease operations by the following Monday if the court

did not authorize it.  Lenders made clear on the record that the Commitment Fee was an express precondition to extend the DIP financing, and payment of the Commitment Fee as an administrative expense was an explicit provision of the Interim DIP Order.

In its Turnover Decision, the bankruptcy court noted that the Committee failed to raise the issue of whether Lenders could establish an administrative expense claim for the Commitment Fee during the interim DIP Motion hearings.  It further noted that the Interim DIP Order made no reference to § 503(b)(1)(A).

After comparing §§ 364(b) and 364(c), the court observed that a debtor's authority to obtain unsecured credit under § 364(c)(1) is expressly premised on its inability to obtain credit under § 503(b)(1), i.e., as an allowable administrative expense under § 364(b).  "There is no other legislative requirement under the statute."  In re Fleetwood Servs., 427 B.R. at 858.  The court further observed that the plain language of the statute "does not say that to establish priority 'over any or all administrative expenses' under § 364(c)(1), lenders must also independently prove their claim qualifies as an allowable administrative expense under § 503(b)(1)(A)."  Id.  While recognizing that § 364(b) requires a finding that the debt was an actual, necessary cost and expense of preserving the estate, § 364(c)(1), which grants priority over § 364(b) claims, does not contain such a requirement.  Id. at 859.  To require such a finding would render § 364(b) "superfluous and put additional burdens on lenders who do not agree to administrative expense priority but instead require priority over those very types of claims."  Id. at 858-59.  Accordingly, the bankruptcy court

- 23 -

concluded that it was not required to find that the Commitment Fee was a necessary expense which actually benefitted Debtors' estates under § 503(b)(1)(A). In re Fleetwood Servs., 427 B.R. at 859 (citing In re Mayco Plastics, 379 B.R. at 701-02 (statutory requirement that a § 364(c)(1) claim must be paid before all administrative expenses precludes such claims from also, simultaneously, being a type of administrative expense allowable under § 503(b)(1))).

On appeal, rather than setting forth any argument as to how the bankruptcy court erred in its interpretation of § 364(c)(1), the Committee continues to argue that Lenders failed to meet their burden of proof that the Commitment Fee was an actual and necessary expense which benefitted the estates. This misstated argument is without merit.

We agree with the bankruptcy court's well-reasoned interpretation of § 364(c)(1). Lenders were not required to show, nor was the bankruptcy court required to find under § 503(b)(1)(A), that the Commitment Fee was an actual, necessary expense, which directly and substantially benefitted the estate. "In any extension of debt financing under § 364, traditional issues such as borrowing conditions, interest rates, loan fees, covenants and remedies upon default will have to be negotiated. Often the debtor in possession will be able to obtain only onerous terms, which the bankruptcy court must balance against the debtor in possession's apparent lack of alternatives." 3 COLLIER ON BANKRUPTCY ¶ 364.04[2][d] (Alan N. Resnick & Henry J. Sommer, eds., 16th ed. 2011) (citation omitted). "Whether or not borrowing under § 364(c) is an ordinary course transaction, both

the loan and its terms must be approved by the court, after notice and a hearing." Id. at ¶ 364.04[3]. "A claim that has been granted such a priority is not, however, properly treated as an administrative expense, because it has priority over administrative expenses and is permitted only if the debtor 'is unable to obtain unsecured credit allowable . . . as an administrative expense,' even though the plan of reorganization must provide for payment of the claim as a condition of confirmation." Id. at 364.04[2][a] (citations omitted).

The bankruptcy court properly applied § 364(c)(1) and concluded it did not need to find that the Commitment Fee was an actual, necessary expense, which directly and substantially benefitted Debtors' estates under § 503(b)(1)(A). The Committee fails again to satisfy the first factor of § 542(a).

**C. The Bankruptcy Court Erred In Its Interpretation Of § 364(e), But Such Error Was Harmless.**

Section 364 generally defines the circumstances under which a debtor may incur postpetition financing and provides certain protections for postpetition lenders who are willing to facilitate such potentially risky financing. One protection is codified in § 364(e), also known as the "safe harbor" provision. It provides:

> The reversal or modification on appeal of an authorization under this section to obtain credit and incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority of lien, were stayed pending appeal. (emphasis added).

- 25 -

Thus, under the express terms of § 364(e), absent a stay pending appeal, an appellate court may not reverse an authorization to obtain credit or incur debts unless the lender did not act in good faith. Burchinal v. Cent. Wash. Bank (In re Adams Apple, Inc.), 829 F.2d 1484, 1487-88. See also Weinstein, Eisen & Weiss, LLP v. Gill (In re Cooper Commons, LLC), 430 F.3d 1215, 1219 (9th Cir. 2005) (holding that the court could not invalidate postpetition financing agreement because to do so would clearly "affect the validity of any debt incurred" which is prohibited by § 364(e)).

As a threshold matter, we conclude, given the issue on appeal in this case, i.e., the denial of the Turnover Motion, that § 364(e) does not apply. The decision we render in this appeal, however, advances the public policy underpinnings of § 364(e). Once again, we are reviewing the extent of the power the bankruptcy court had to modify or review the Commitment Fee provisions in the Interim DIP Order. The bankruptcy court suggests in the context of the Turnover Motion that § 364(e) is implicated anytime an order by a bankruptcy court is challenged after a lender relies upon such order's protection and that if the order incorporates a contractual provision similar to the statutory provision contained in § 364(e), it effectively protects the Lender advancing pre-appeal credit pursuant to such order. The bankruptcy court concluded that if a court is requested to review a previously issued order under § 105 or Civil Rule 60(b), then modification of such order would "pose the same risks as does reversal on appeal." In re Fleetwood Servs., 427 B.R. at 860 (citing Kham & Nate's Shoes No. 2, Inc. v. First

- 26 -

Bank of Whiting (In re Kham & Nate's Shoes No. 2, Inc.), 908 F.2d 1351, 1355 (7th Cir. 1990)). In closer review, we discern that the Seventh Circuit panel further qualified the above statement by concluding that "§ 364(e) does not apply by its own terms . . . [even though] its principle applies. . . ." In re Kham & Nate's Shoes No. 2, 908 F.2d at 1355. The Ninth Circuit in In re Adams Apple, 829 F.2d at 1487-88, agreed with the Seventh Circuit by generally stating that an "appellate court may not reverse the authorization to obtain credit or incur debts under [§] 364 if the authorization was not stayed pending appeal unless the lender did not act in good faith." The plain meaning of the statute limits any reversal or modification under § 364(e) to the appellate courts. See Lamie v. United States Tr., 540 U.S. 526, 534 (2004). In interpreting the Bankruptcy Code, the U.S. Supreme Court has held "as long as the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language of the statute." BFP v. Resolution Trust Corp., 511 U.S. 531, 566 (1994). Consequently, § 364(e) is not available to the bankruptcy court for the purposes of "reversal or modification" of one of its own orders. The utilization of § 364(e) by the bankruptcy court to conclude that it would not modify its Interim DIP Order when considering the Turnover Motion, however, is harmless error. The decision of the bankruptcy court will not be reversed for harmless error. In re Va Bene Trist, LLC, 2012 WL 37346 at *1. Neither party is harmed by the bankruptcy court using § 364(e) in its analysis because the Committee is arguing that it should not be applied, and the Lenders prevail on appeal without the

application of the statutory provision.

## VI. CONCLUSION

For the foregoing reasons, the bankruptcy court did not err in denying the Turnover Motion.  Therefore, we AFFIRM.

PAPPAS, Bankruptcy Judge, Concurring.

I agree we should affirm the order of the bankruptcy court refusing to require a return of the loan commitment fee paid by Debtors to BofA.  I write separately to emphasize that, while I might have reached a different result, the bankruptcy court did not abuse its discretion in making its decision.

In the early days of a complicated chapter 11 case, after three days of hearings, at Debtors' urging, but over the genuine objections of the Committee, the bankruptcy court approved the Debtors' interim financing arrangement with BofA.  Though the Committee railed against it for what might be good reasons, Debtors insisted that the BofA deal was the only credit available to fund their reorganization efforts.  After considerable questioning and deliberation, the bankruptcy court eventually relented and granted Debtors' request.  Of course, BofA's commitment to "help" Debtors did not come cheap; while the interest rate on the BofA financing package was supposedly a reduced one, the up-front fee payable to BofA for its commitment to provide modest additional credit to Debtors was a whopping $2.4 million.  As things turned out, Debtors never drew upon the BofA credit line (other than to pay BofA), and as the Committee

- 28 -

predicted, BofA received a fee that was likely out of proportion to any risk it incurred.

This appeal results from the Committee's disappointment that the bankruptcy court refused to reconsider its approval, and direct the return of the BofA fee. The Committee's frustration with this outcome is understandable. In blessing the deal, the bankruptcy court's comments at the hearings were, at times, equivocal concerning whether the parties and court could, down the road, take a second look at the propriety of the BofA commitment fee. Early in the hearings, the court indicated that, if after approving the financing package it later appeared that BofA had not "earned" the fee, "maybe we can get it back." Then, at the eleventh hour of the proceedings, when BofA's attorney reminded the bankruptcy court about the terms of the financing agreement (i.e., "no fee, no credit"), the court approved the generous fee, indicating that the court's approval of the fee would be "irreversible."

Whether to approve the Debtors' motion and the BofA loan, with the attendant commitment fee, was a hard choice for the court, and under the Code, clearly a matter requiring the exercise of discretion by the bankruptcy judge. While the Committee argues BofA received a windfall, which in retrospect appears fairly obvious, at the time it made the decision, the bankruptcy court had been given evidence and heard testimony to show that the BofA credit facility was not just necessary, but essential, and that given Debtors' dire circumstances, it was the only deal in town. Faced with management's claims that, if the BofA arrangement were not approved, the company might close down,

the bankruptcy court certainly had an adequate factual basis to approve the financing terms under § 364(c) of the Bankruptcy Code.

Though the commitment fee was approved, the Committee argues that the bankruptcy judge could have changed her mind because the approval of the BofA fee was not "final," but instead was only "interim," subject to ready reconsideration depending upon subsequent events. The bankruptcy court rejected this argument, holding that the provisions of the order approving the BofA commitment fee were indeed final, even if other aspects of the order were not. As we must, I defer to the bankruptcy court's plausible interpretation of the terms of its own order.

The bankruptcy court also did not abuse its discretion in declining the Committee's invitation to modify its approval of the BofA fee by using its § 105(a) powers, or under Rule 9024/Civil Rule 60(b). However, in its thoughtful, comprehensive decision, the bankruptcy court explained its view that modifying an important term of a negotiated credit agreement, even when viewed in the rear-view mirror the deal appears improvident, would be unfair to the parties and have serious implications for the integrity of the reorganization process. This conclusion is also defensible. While it is also a serious concern that a post-petition lender may have unduly profited at the unsecured creditors' expense, I reject the Committee's suggestion that this Panel should reverse the bankruptcy court simply because we may disagree with the outcome here. Until such time as bankruptcy judges are issued a crystal ball to assist in making difficult decisions, this Panel should

defer to a bankruptcy court's discretionary decision when based upon the best proof available at the time.[10]

In sum, though Debtors were eventually able to finance their post-bankruptcy operations with cash collateral, and did not need the credit extended by BofA, because bankruptcy judges are not clairvoyant, the Panel must measure a bankruptcy court's exercise of its discretion based upon the record at the time of that decision, not based on facts that only later come to light. Moreover, sometimes a deal is a deal; despite subsequent events, the bankruptcy court must have the discretion to decline to modify its prior order if to do so could be unfair to the parties or detrimental to the bankruptcy process. While I regret the impact on the unsecured creditors in this case, and though I may have come to a different result, on this record, the bankruptcy court's decision not to modify the BofA commitment fee was justified and should be affirmed.

---

[10] I agree with the majority that § 364(e), which applies only to reversals or modifications of credit orders "on appeal," provided no protection to BofA in this context. I also endorse the notion that, under these facts, BofA was not required to satisfy the § 503(b)(1) elements to retain the commitment fee. In other words, the bankruptcy court committed no reversible legal error in this case.